# Exhibit "A"

# POLICE AND JAIL PROCEDURES, INC.

### RICHARD LICHTEN, CLS

January 10, 2016

Mr. Dale K. Galipo
Law Offices of Dale K. Galipo
21800 Burbank Blvd, Suite 310
Woodland hills, CA 91367

Mr. John C. Fattahi
Attorney at Law
1301 West Glenoaks Blvd
Glendale, CA 91201

Dear Mr. Galipo and Mr. Fattahi:

Regarding: Rule 26 report for the case of:

Stephany Borges, individually and successor-in-interest to Daren Borges, Plaintiff

Vs.

City of Eureka; Michael Stelzig; Bryon Franco; John Drake Goodale; County of Humboldt; Sheriff Michael Downey; Tim Hershberger; David Swim; Terri Bittner; Tim Hammer; Leo Basler; California Forensic Medical Group; Incorporated, a California Corporation; Robert Eury; Ann Hampton, and DOES 1 – 10, inclusive, Defendants.

Case number: 15-cv-00846-YGR in the United States District Court Northern District of California

## Introduction:

I have been retained as an expert in the above case.

I am a thirty-year law enforcement veteran. Twenty of my thirty years were in supervisor and management positions. I have 30 years of experience in patrol, detectives, narcotics, and large jails (over 4,000 inmates). I have investigated crimes that occurred in patrol and in the jails including experience responding, handling, and supervising calls involving mentally ill persons. In my career as a sergeant and watch commander I have amassed years of experience in analyzing use of force by my subordinates in patrol and in the jails to determine if the force

used was proper, reasonable, and within policy. I have held many in-service emergency response training sessions in jails and in patrol. I have commanded scenes at officer involved shootings and have been involved in the shooting investigation process. I have lectured to the American Jail Association in other states about inmate riots, removal of hostile inmates from their cells, less than lethal weapons, and other jail emergencies.

I have also lectured to the LASD Supervisor Jail Incident Command School on the handling of major inmate disturbances (riots) and other emergencies, including medical emergencies.

I have expertise in the manufacture, possession, and use of jail/prison-made weapons. I am a requested lecturer to investigator and attorney groups in the area of police use of force in patrol and in the jails.

I have testified as an expert in United States District Court and in California and Nevada state courts in:

> Use of force   (California and Federal District Court)
> Use of the TASER   (California Courts + in a Published Opinion)
> Police practices   (California, Nevada, and in Federal Courts)
> Arrest Warrant Operations   (Nevada Courts)
> Exigent v. Non-Exigent police entry (California Courts)
> Citizen's right to resist excessive force by the police (California Courts)
> Citizen vs. citizen self defense (Nevada Evidentiary hearing)
> Emergency Vehicle Operations   (California Courts)
> Narcotics (California and Nevada Courts)
> Sexual assault investigations   (Federal Courts)
> Evidence collection in firearms cases   (California Courts)
> Use of private security guards   (California Courts)
> Prison inmate culture:   (California and Federal Courts)
  - Jail-made weapons  (carrying, using, and manufacture)
  - Gang vs. non-gang attacks on staff
  - Contraband and other topics
  - Food service – safety concerns (Federal Courts)
  - Safety checks and California Title-15 safety checks (Federal Courts)
  - Sick call and inmate refusing medical care (Federal Courts)
  - Solicited v. non-solicited inmate reading material (Federal Courts)
  - Possession of drugs for sale vs. personal use in state prison (CA Ct)

I have been accepted as a police practices expert by the Los Angeles County Superior Court Committee of Superior Court Judges who have been appointed to maintain a Panel of Expert Witnesses. I am a member of the Public Defender's Office police experts' databases in Riverside County, San Bernardino County, San

Diego County, Kern County, and Orange County. I am a member of the Federal Court Defender's office police experts' database. I have lectured many public defenders in various counties about the use of force and other topics including the use of the Taser and jail topics as well.

I have earned the designation of Certified Litigation Specialist (CLS) from the Americans for Effective Law Enforcement (AELE). The Americans for Effective Law Enforcement was formed in 1966 and opened the Law Enforcement Legal Center in 1973. AELE is a research driven educational organization that produces and disseminates legal information through traditional seminars, via electronic media, and direct contact. I received my certification after completing the following litigation-related required training in:

> Lethal and Less Lethal Use of Force
> Arrest-Related, Excited Delirium, Sudden In-Custody Death, Jail Suicide
> Management, Oversight, and Monitoring of Use of Force, including ECW (TASER) Operations and Post-Incident Forensics
> Discipline and Internal Investigations

The Institute for the Prevention of In-Custody Deaths (IPICD) certified me as an instructor in the Prevention and Management of Suicide in Law Enforcement (both in patrol and in the jails). The Institute for the Prevention of In-Custody Deaths (IPICD) certified me as an instructor in Excited Delirium and Agitated Chaotic Events, Recognition Responding, Managing, and Investigating Arrest-Related and Sudden, In-Custody Deaths.

My use of force and Taser use expert testimony was cited in the May 30, 2012, published opinion of the Court of Appeal of the State of California, Second Appellate District, Division Eight, Alma Mendoza v. City of West Covina, et al., B227812, (Los Angeles County, Superior Court. Number: BC387119). In this opinion, the judgment was affirmed.

Unless otherwise indicated I assume that the evidence and circumstances as presented by the defendants, plaintiff and witnesses are correct, based on their sworn statements and testimony under penalty of perjury. I also assume that unsworn statements made by the plaintiff, defendants, and witnesses are correct unless otherwise indicated.

After careful evaluation of all the evidence and circumstances that are known to the defendants, plaintiff, and witnesses at the time of this incident, I formed a number of opinions as to the actions of the personnel involved in this case and procedures and accepted practices that were and were not followed in this case.

I based my opinions on the materials I have identified. I applied my training, knowledge, and experience concerning proper police/jail practices in considering the evidence. My opinions are expressed to a reasonable degree of professional certainty or probability.

Pursuant to the requirements of Rule 26, I have studied the reports and other material provided to me and listed them below regarding this case. Please be advised that if there are any additional depositions, investigations, policies, reports, memos, video recordings, photos, or other materials produced in this case, a supplemental report may be necessary; thus I reserve the right to supplement my opinions and/or this report.

**Retention:**

On October 29, 2015, I was retained by attorneys Mr. Dale Galipo and Mr. John Fattahi on behalf of the plaintiff. I was asked to review documents and render expert opinions about this case.

**Primary opinions:**

Based on my understanding of my review of the listed materials, it is my opinion as determined by standard police and jail practices that:

Opinion #1:

> ➢ Reasonably trained police officers in Eureka Police Officers Stelzig's and Franco's position would have known the decedent was in need of immediate medical care and failed to provide that care.

> o Officer Stelzig and Officer Franco failed to react to what should have been an obvious medical emergency that the decedent was suffering. The officers' failure to summon medical help for the decedent was unreasonable and inconsistent with accepted police training and standards (including POST).

Opinion #2:

It was proper for Officer Stelzig and Officer Franco to discuss with each other the issue of whether the decedent needed to be taken to the hospital if they were not absolutely certain he needed medical attention; however, they reached the wrong conclusion.

4

Opinion #3:

> When the decedent was brought into the jail by Officer Stelzig the decedent's mental and physical condition was poor. The failure of Corporal Bittner, Corporal Hammer, and Officer Swim to summon the jail nurse to render medical care to the decedent was unreasonable, inconsistent with accepted police and jail training and standards, and in violation of department policy.

>> o Reasonable officers would have immediately called for the nurse to respond to care for the decedent.

> Supervising Correctional Deputy Hershberger was the person in charge when the decedent was brought in. He watched the decedent during the pat down process and was in a position to see his poor medical and mental conditions, coupled with his physical actions. Since Supervising Correctional Deputy Hershberger did not take charge and did not summon the jail nurse, Supervising Correctional Deputy Hershberger's inaction was unreasonable, inconsistent with accepted police and jail training and standards, and in violation of department policy.

Opinion #4:

> Due to the decedent's poor medical and mental conditions, coupled with his physical actions, Supervising Correctional Deputy Hershberger, Corporal Bittner, Corporal Hammer, and Officer Swim violated jail policy by failing to have the jail nurse examine the decedent in the booking area before the decedent was placed into the sobering cell.

>> o Failure to have the decedent examined by the nurse before placement in the sobering cell endangered the decedent's health and welfare.

Opinion #5:

> Supervising Correctional Deputy Hershberger, Corporal Bittner, and Officer Swim watched the decedent's highly agitated and bizarre behavior on the cell camera monitor and failed to immediately call for the nurse and then go and check on the welfare of the decedent. Their failure to act was unreasonable and inconsistent with accepted police and jail training and standards.

Opinion #6:

➢ The decedent's sobering cell 15 minute safety cell checks were performed improperly in violation of sobering cell jail policy, B-007, the Safety Check policy F-018, item 41, for sobering cell, in violation of Title 15, section 1027, safety checks, and was below the standard of care.

    o Had the safety checks been properly performed and had the officers reacted reasonably to the decedent's obvious medical distress, emergency medical care would have been summoned at once. Due to the delay, the decedent was denied prompt care for his serious medical needs.

Opinion #7:

➢ The correctional staff's training was deficient.

    o A "disconnect" existed between the written policies and procedures, the training that the correctional staff received, and what occurred in actual practice.

## Summary of the incident:

### Date, Time and Location of occurrence:

The date of the incident is June 13, 2014. The incident occurred at two locations, including the time spent transporting the decedent to the jail.

The first location was where the decedent was arrested by Officer Michael Stelzig at about 1408 hours. This location was at 7th Street and "D" Street, in the City of Eureka, CA.

The second location was at the Humboldt County Correctional Facility (herein known as the jail) located at 826 4th St, Eureka, CA 95501. This is where the decedent was taken by Officer Stelzig.

### Description of the Humboldt County Correctional Facility:

The following jail information was taken from the Sheriff's Department website:

➢ The Custody Services Bureau is the largest bureau in the Sheriff's Office with 131 full time employees, including 116 Correctional Officers.

> The Custody Services Bureau's primary function is the care and custody of sentenced and non-sentenced inmates incarcerated in the Humboldt County Correctional Facility (HCCF).

> Located in downtown Eureka adjacent to the County Courthouse, the HCCF spans approximately 155,000 square feet on 6 floors and has a board rated capacity of 411 beds.

> The county contracts with the California Forensic Medical Group (CFMG) for 24 hour onsite medical and dental care.

> The facility contains a short-term care medical housing unit accredited by the Institute for Medical Quality.

> The jail has three sobering cells which have padded floors and padded privacy walls by the toilet (Hershberger page 27 of his deposition).

**The Decedent and cause of his death:**

The plaintiff is Daren Ethan Borges, male white, who was 42 years old at the time of his death.

The autopsy report by Dr. Mark Super stated the cause of death was Acute Methamphetamine Intoxication.   Dr. Super also stated, "Historically, he was exhibiting some signs of excited delirium…and some of his actions could also be attributed to his underlying psychiatric disorder."

**Brief synopsis of what occurred:**

On June 13, 2014, Eureka Police Officer Stelzig arrested the decedent for public intoxication.  The decedent was also suffering a medical emergency.  Neither Officer Stelzig nor Officer Franco, who were present, called for emergency medical help or took the decedent to the emergency room before taking the decedent directly to the jail.

Once at the jail, the decedent was brought into the intake room accepted into custody by the jail officers at about 1434 hours.  The decedent was left standing against a wall until he was approached by Corporal Bittner and Officer Swim at about 1436 hours, patted down, and escorted to the jail's sobering cell.

The decedent was not first assessed (seen, questioned, vital signs taken, etc.) by the jail nurse in violation of jail polices.  The decedent needed a lot of help walking to the sobering cell.

The decedent was found unresponsive at about 1600 hours at which time CPR was administered by the jail officers and the jail nurse. The Fire Department arrived at about 1608 hours and the ambulance arrived two minutes later. The decedent was taken to St. Joseph's Hospital where was he pronounced dead a short time later by Dr. Brian Laakaniemi. The time of death is listed at 1634 hours.

**My analysis, basis, and findings for my opinions:**

**What is proper, reasonable, and best police practice during the arrest of the decedent at the first location?:**

Professionally trained, reasonable officers know that it is the proper police practice:

- to follow their POST first aid training and department first aid training and react reasonably when the arrestee is in need of emergency medical care and treat it as a medical emergency and either call for the paramedics or quickly transport the arrestee to the emergency room

- to follow their "Providing Prisoners Medical Care" training and react reasonably when the arrestee is in need of emergency medical care and treat it as a medical emergency

- when confronted with an arrestee who there is good reason to believe had been "...possibly hitting his head on the ground" to either call for the paramedics to respond or quickly transport the arrestee to the emergency room

- to follow their "Drug, Under the Influence" training and react reasonably when confronted with a prisoner who is suffering signs of an overdose medical emergency and summon the paramedics or transport to the emergency room at once

- to err on the side of caution and provide emergency medical care to the arrestee who is displaying what should be obvious signs and symptoms of a medical emergency to ensure the safety of the arrestee, even if the arrestee does not ask for medical help

- to err on the side of caution and summon emergency medical care to field assess the prisoner's health and welfare before taking the prisoner to jail where there is even the slightest doubt as to the health of the prisoner

8

> to always seat belt in the arrestee before driving away in accordance with the "Transportation of Prisoners, Sick...Mentally Ill, and Use of Seat Belts" training and policy as well as the California seat belt law

> to closely monitor the arrestee and if during transport the arrestee's condition is deteriorating, then react reasonably and either transport directly to the emergency room, or immediately inform the jail medical staff of the arrestee's medical emergency immediately upon arrival at the jail

> to fully inform the receiving jail officers of the complete circumstances of the arrest and be especially careful to inform the jail officers about the prisoner's physical and mental condition, if there was any agitated behavior, and if there was a change in the prisoner's condition and/or behavior from the time of arrest

**The International Associations of Chiefs of Police — Best Practices:**

> The IACP states that, "Officers should be aware of physical reactions by keeping close watch over the prisoner and any lethargy or unresponsiveness on the part of the prisoner should be taken seriously and medical aid summoned immediately."

**The Eureka Officer's actions:**

**The scene of the decedent's arrest:**

1. Arresting Officer Stelzig's initial arrest report states he arrived at the location, observed the decedent to be intoxicated on drugs, and arrested the decedent.

   1.1.    Officer Stelzig's initial arrest report stated the decedent was swaying and noted the decedent's attitude fluctuated without reason.

2. Later in the day, when Officer Stelzig was notified the decedent had died at the jail, the officer wrote a supplemental report with more detail.

   2.1.    In Officer Stelzig's supplemental report, he stated he observed the decedent sweating profusely, had a blank stare, was mumbling, had "uncontrollable movements" of his mouth and hands, his facial expression went from "normal" to appear angry, the veins in his neck pulsated, and he clenched and unclenched his teeth.

2.2.　　Officer Stelzig stated the decedent was "...really amped up" and was "highly under the influence of a stimulant that I believed to be methamphetamine."

2.3.　　Officer Stelzig stated that due to the decedent's lack of visible injury requiring medical attention, Officer Stelzig did not believe the decedent needed medical attention prior to booking him at the jail.　Officer Stelzig stated that Officer Franco, who had pulled up to assist, agreed with him.

3.　Officer Stelzig stated in his deposition on pages 34-36 that the decedent was profusely sweating, had uncontrollable movements of his hands and face, was mumbling, swaying, and his facial expressions changed from normal to angry.

3.1.　　Officer Stelzig stated on page 45 of his deposition when asked about the decedent's level of intoxication, that "It would go with the high end."

4.　Officer Stelzig stated on page 27 of his deposition Officer Franco stated on page 19 of his deposition they had received information in the call that the decedent had been throwing himself on the ground and hit his head on the ground.

4.1.　　Professionally trained, POST certified, reasonable officers know from their POST first aid training, POST Learning Domain 34, First Aid, Traumatic Injuries, Head Injuries, section 4-3 and 4-4:

4.1.1.　　"The extent of a head injury may not always be obvious."

4.1.2.　　Other indications of a possible head injury:

4.1.2.1.　　Agitated or confused

4.1.2.2.　　appears intoxicated

4.1.2.3.　　appears groggy (nodding off as seen in the police car)

4.2.　　Based on the information Officer Stelzig and Officer Franco had at the time, they failed to react reasonably to the possibility that the decedent had suffered a head injury.　A reasonable officer would have either called for paramedics or taken the decedent directly to the emergency room.　It is always best practice to err on the side of caution and provide emergency medical care in a case like this, especially since, "The extent of a head injury may not always be obvious."

5. Officer Franco wrote in his report that he observed the decedent sweating profusely, could not stand still, had rapid movements and body tremors and had rapid speech.  Officer Franco stated since the decedent showed no sign of an injury, Officer Franco agreed with Officer Stelzig that medical aid was not needed.

    5.1.    The symptoms described by Officer Stelzig and Officer Franco are not only consistent with the use of a stimulant such as methamphetamine, but are also consistent with a possible head injury (the decedent hitting his head on the ground) as well as consistent with the state of excited delirium.

        5.1.1.    According to the Institute for the Prevention of In-Custody Deaths, excited delirium is a medical emergency.

**Not all injuries and illnesses are visible:**

6. Professionally trained, reasonable, POST certified officers know that just because a person may not display visible signs and symptoms of an injury or an illness, that does not mean they are not hurt or sick.  While reasonable officers are not typically medical professionals, all POST certified officers have had basic first aid training and ought to know when to summon paramedics, etc. to make that determination.

**What the witnesses stated:**

7. Mr. Rich Anderson saw the arrest of the decedent.  Mr. Anderson stated the decedent had been removing his clothing and licking and hitting his head on the ground.  Mr. Anderson stated when Officer Stelzig arrested the decedent the officer helped him sit down.  Mr. Anderson stated the contact between the decedent and the officer was calm and mellow.  Mr. Anderson stated the officer treated the decedent with respect.

8. Ms. Katherine Smith stated that she may have seen the decedent it his head on the ground before the officer arrived.  Ms. Smith stated she is positive Officer Stelzig did not strike the decedent in any way.

9. Investigator Bernstein of the Office of the District Attorney wrote an investigation report.  In the report, item 11, he interviewed two witnesses who saw the decedent at the time Officer Stelzig arrested him.  These two witnesses are Larry and Kim Madden.

9.1.    Investigator Bernstein wrote that the Maddens expressed their opinion that the decedent looked like "...he was having a medical emergency rather than being intoxicated."

9.2.    Larry Madden pointed out that the officer seemed nice and was concerned about the decedent.

9.3.    Larry stated that he was a drug addict for many years and in his opinion what he saw of the decedent did not seem like a "drug induced issue." Larry stated the decedent seemed disoriented and would just stare and not respond to the officer.

9.4.    Kim Madden stated that the officer asked the decedent questions such as "What is wrong?" and "What are you on?" Kim stated the decedent was not talking or responding to the officer. Kim again stated the officer kept asking the decedent, "Can you talk to me and tell me what is wrong with you?"

9.5.    Based on the nature of the questions these two witnesses heard Officer Stelzig ask the decedent, coupled with the decedent not responding to these questions, a reasonable officer in Officer Stelzig's position would have immediately called for an ambulance or had taken the decedent right to the emergency room.

**The temperature in the city that day:**

10. Both officers stated the decedent was sweating profusely. According to the weather history for the City of Eureka that day, item 5A, the highest temperature recorded for that day was only 62 degrees. The temperature history was found at www.wunderground.com, Weather History for Eureka, CA.

**What is seen on Officer Stelzig's the patrol car dash camera video:**

11. When Officer Stelzig responded to the location of the decedent, Officer Stelzig had his police car's dash camera turned on. The following are highlights of what was recorded.

11.1.    As the officer pulls up the decedent is seen sitting on the sidewalk with his pants down by his knees. The decedent is without his shirt. The decedent is seen tossing his jacket on top of a parking sign. The decedent had been holding his shirt which he then put on as the officer puts on rubber gloves.

12

11.2.   The officer briefly talks with the decedent then has the decedent lay face down, at which time the officer handcuffs the decedent.  The officer then helps the decedent to his feet and helps him walk to the police car out of dash camera view.

11.2.1.    The careful manner in which Officer Stelzig handcuffed the decedent was reasonable and does not appear that unreasonable or excessive force was used.

11.3.   The decedent's physical condition began to observably deteriorate once he was placed in the rear seat of the police car which is easily seen on the rear seat camera video.

11.4.   The next view from the dash camera is when the officer pulls away from the location and drives to the jail.

**What is seen on the patrol car rear seat camera video:**

12. Officer Stelzig's police car had a camera focused on the rear seat.  There is no sound with the video.  The decedent is seen seated in the rear seat behind the officer.

12.1.   The rear seat video shows the decedent experiencing mood changes, extreme agitation, sweating profusely, and behaving irrationally.  His condition is deteriorating before the officer drives to the jail.

**What is heard on the patrol car rear seat camera video:**

13. While the decedent was seated in the rear seat and before he arrived at the jail, I was able to hear him mumbling about his pants and then the mumbling turned into slurring and I could not understand what he was trying to say.

13.1.   Any professionally trained, reasonable officers who would have been in a position to have heard the decedent's mumbled and slurred speech would have had the decedent medically evaluated out of an abundance of caution before taking him to the jail.

**Before the officer pulled away, the decedent is seen on video:**

14. Talking to himself or to an imaginary person and at times appears to be talking to the officer who is off camera.

13

14.1.  The decedent stares straight ahead and then begins to toss his head from side to side.  The decedent tightly closes is eyes and talks to himself.

14.2.  The decedent is sweating.  His legs begin to tremor.  He looks highly agitated.  He has his eyes wide open and tosses his head from side to side while moving is lips.  The decedent is breathing faster than before.

14.2.1.  Sweating profusely and increased respiration are two of the agitated behavior indicators of a person in the state of excited delirium.

14.3.  The decedent nods off with his head to his left side (2:46 minutes into the video).  The decedent then wakes up and starts to have a body tremor while mumbling to himself.

**Officer Franco's observations:**

15. Officer Franco stated in his deposition on page 23 and 24 that he observed the decedent sweating profusely, saying words without meaning, and could not stand still.

15.1.  Officer Franco added on page 25 and 26 that the decedent was having body tremors, and at times appeared calm, then angry, and then calm again.

15.2.  Officer Franco stated on page 27 he felt the decedent was under the influence of a stimulant.

15.3.  Officer Franco stated on page 29 that he saw the decedent stripping off his clothes.  Officer Franco stated, "To me that is not normal."

15.3.1.  What Officer Franco described is a person displaying signs and symptoms consistent with the state of excited delirium.  It is common in excited delirium cases for the person to take off their clothes to cool down.

**Officer Stelzig and Officer Franco failed to react reasonably to the possibility that the decedent had overdosed on methamphetamine:**

16. Officer Stelzig wrote in his supplemental report that decedent was "...really amped up" and was "highly under the influence of a stimulant that I believed to be methamphetamine."

16.1.   Reasonable officers who have had under the influence training and POST controlled substances training know that a stimulant does not normally cause a person to nod off and/or go to sleep.

16.2.   Reasonable officers also know that if a stimulant such as methamphetamine is suspected, if the person still nods off, etc., there is the very real possibility the person may have overdosed on the drug.

16.3.   Professionally trained, POST certified, reasonable officers know from their POST training that a person can be poisoned by taking a stimulant such as methamphetamine.

16.3.1.   When a person takes methamphetamine they can suffer sudden unexplained severe illness.  Some of the indicators that are taught to all POST certified officers are altered mental status, confusion, body tremors or shaking, and profuse sweating, etc., POST LD-34, 5-23.

16.4.   Any professionally trained, POST certified, reasonable officer would know that given the symptoms displayed by the decedent, the decedent was suffering a medical emergency.

16.5.   Any reasonable officer who has arrested a person who may have overdosed should always call for paramedics or take the person directly to the hospital.

**The decedent was not seat belted in:**

17. Professionally trained, POST certified, reasonable officers always check on their prisoner before any transport.  These same professionally trained, POST certified, reasonable officers know to always make sure to put their prisoner's seat belt is on.

17.1.   The video shows the decedent never had his seat belt on.  It is highly probable that had the officer placed the seat belt on the decedent before driving away, the officer would have seen more of the decedent's deteriorating condition and reacted to it by either calling for paramedics or taking the decedent directly to the emergency room.

17.1.1.   Officer Stelzig's training records, bates FTP-61, EURE-960, show the officer had been trained in the proper use of seat belts for his prisoners.

18. Not seat belting in the decedent is a violation of department policy, number 1022.3, Seat belt Procedure.

19. Officer Stelzig's rear seat camera showed the decedent was sitting in the rear seat handcuffed for several minutes while Officer Stelzig and Officer Franco talked about whether the decedent required medical care.

    19.1.   This would have been an opportune time, out of an abundance of caution, to call for the paramedics to field assess the decedent's medical condition.

**Officer Stelzig was asked about a person who is highly under the influence of drugs:**

20. On page 64 of Officer Stelzig's deposition he was asked if he was trained to call for the paramedics or take a person to the hospital if the person is conscious and can stand but is displaying signs of being highly under the influence.  Officer Stelzig stated on page 65, "I'm not trained and I don't have any tools in the field to tell me the level of intoxication that someone might be in."

21. On deposition page 66 Officer Stelzig was asked, "...if somebody's under the influence, but they can walk, talk, and stand, then they're going to jail unless there's some other issue?"  Officer Stelzig agreed if, "...they can meet all those criteria...yes, they would go to jail."

    21.1.   Based on Officer Stelzig's the first aid training and under the influence of drug training, he was trained to recognize persons who are highly under the influence, or as Officer Stelzig stated, being on the "high end of intoxication."

    21.2.   A reasonable officer who was confronted with all of the signs and symptoms as displayed by the decedent would have either called for the paramedics or taken the decedent directly to the hospital.

    21.3.   A reasonable officer who has had basic first aid training would know that a person can still be suffering a medical emergency even if that person can walk, talk, and stand.

    21.4.   On deposition page 71 Officer Stelzig was asked if he was trained that people under the influence of drugs and have extreme agitation, irrational behavior, and profuse sweating can be of increased risk of sudden death. Officer Stelzig replied, "In certain situations, yes."

**The officer drives the decedent to the jail:**

22. From what is seen on the video, Officer Stelzig pulls away from the curb at about 3 minutes into the video. As stated above, the decedent was not seat belted in.

23. During the drive to the jail the decedent is seen nodding off, moving his head for side to side, mumbling, and breathing rapidly. The decedent is sweating more as evidenced by the perspiration on his head. The decedent wipes the sweat from his brow with his pant leg a few times.

   23.1.  At times it looks as though the decedent winces as if in pain.

   23.2.  As stated in this report, sweating profusely is one of the indicators in a stimulant overdose as well as in excited delirium. Both conditions are a medical emergency. Reasonable officers know this.

      23.2.1.    This is why reasonable officers will always call for paramedics or take the arrestee to the emergency room.

24. All professionally trained, POST certified, reasonable officers know to supervise their prisoners during transport. According to the video time line it took several minutes to drive to the jail. During the trip the officer had many opportunities to react to the decedent's deteriorating condition and take him straight to the emergency room but failed to do so.

25. Officer Stelzig and Officer Franco failed to react to the decedent suffering what should have been an obvious medical emergency. Because neither officer called for the paramedics or transported the decedent directly to the emergency room, the officers' actions were unreasonable and inconsistent with accepted police training and standards (including POST).

**POST first aid training all sworn officers receive:**

26. To better understand why Eureka Officers Stelzig and Franco ought to have been able to react quickly and know just how seriously ill the decedent was and why these officers ought to have quickly called for emergency medical care for the decedent, it is important to know what POST first aid training all California POST certified sworn officers receive.

27. Based on the objective visible symptoms displayed by the decedent while in the street and in the police car, reasonable officers would have reacted when the decedent was in need of emergency medical care and called for help.

28. POST trained and certified officers all receive first aid training in the academy. All POST trained officers are taught to react to medical emergencies and to call for medical help.

   28.1.  Professionally trained, POST certified, reasonable officers know from their POST training that it is the job of a peace officer to keep the community safe and secure, LD-1, 2-9.  They also know that if they have a reasonable opportunity to intervene to prevent harm from occurring they must take action. LD-1, 2-21.

29. Professionally trained, POST certified, reasonable officers know when they see a person who is sweating profusely along with body tremors and shaking that those are some indicators that a person may have taken a stimulant, LD-12, 2-14.

30. Professionally trained, POST certified, reasonable officers know from their POST training that a person can be poisoned by taking illegal drugs.  When a person takes illegal drugs they can suffer sudden unexplained severe illness. Some of the indicators of a person ingesting an illegal drug that is taught to all POST certified officers are altered mental status, confusion, body tremors or shaking, and profuse sweating, etc., LD-34, 5-23.

   30.1.  The video shows many of these symptoms including the decedent's shirt soaked with sweat.

31. Professionally trained, POST certified, reasonable officers know from their POST training that at the time of the initial arrest, the arresting officers are responsible for the care and custody of an arrested person, LD-31, 1-3.

   31.1.  Reasonable officers know that it is below POST standards to fail to uphold the expected level of care under the provisions of state and federal laws, LD-31, 1-5.

32. Reasonable officers know that conditions requiring urgent medical care include drug overdoses and unresponsiveness. LD-31, 3-6.

   32.1.  Reasonable officers must always remember that they have a responsibility to insure that sick persons receive appropriate medical attention.

      32.1.1.  This includes possible drug overdose, LD 31, 3-7

33. Professionally trained, POST certified, reasonable officers know from their POST training that it is their duty to ensure the safety of ill or injured

persons, to properly evaluate emergency situations, to take necessary actions for the well-being of the ill or injured person (calling for paramedics or transporting to the hospital), LD-34, 1-3.

34. It is the best practice for reasonable officers to err on the side of caution and always call for paramedics to evaluate an arrestee even if there is the slightest possibility of sickness or injury.

**Officer Stelzig's related training:**

35. According to Officer Stelzig's training records, item 17, he had received the following training:

   35.1.  Providing Prisoners with Medical Care

   35.2.  Transportation of Prisoners, Sick…Mentally Ill, and Use of Seat Belts

   35.3.  Special Consideration for Sick Prisoners

   35.4.  Mentally Ill Prisoners

   35.5.  First Aid

   35.6.  Drugs – Under the Influence

   35.7.  Drug Recognition, depo page 18

**Officer Franco's related training:**

36. According to Officer Franco's training records, item 17, he had received the same training as Officer Stelzig including drug recognition training (depo page 17).

**What would reasonable officers have known about the decedent's medical condition at the time he was arrested and taken to the jail?:**

37. Under the evidence of this case, reasonable officers would have known the decedent:

   37.1.  was under the influence of a stimulant, in this case methamphetamine

   37.2.  was exhibiting signs and symptoms of an overdose of the stimulant

   37.3.  was probably mentally ill

19

37.4.  was in an agitated state

37.5.  was exhibiting signs and symptoms consistent with the state of excited delirium which is considered a medical emergency

37.6.  may have a head injury (based on the call of him hitting his head on the ground)

37.7.  was at risk of sudden death

37.7.1.  The Institute for the Prevention of In-Custody Deaths (IPICD) defines sudden in-custody death as death within 24 hours of confinement.

**Use of the Taser policy:**

38. At no time did anyone use the Taser on the decedent.  However, even though the Taser was not used, the police department's Use of Taser policy, section 309.4, subsection (e), is applicable in this case.

38.1.  That section states in part, "Persons suspected of being under the influence of drugs…who exhibit extreme agitation…irrational behavior accompanied by profuse sweating…may be at risk of sudden death and should be examined by qualified medical personnel as soon as practicable.  Any individual exhibiting signs of distress after such an encounter shall be medically cleared prior to booking."

**Excited Delirium – signs and symptoms:**

39. In my evaluation of this incident, the decedent's agitated state and reported behaviors are consistent with my training in recognizing a person being in a state of excited delirium.

40. According to the Institute for the Prevention of In-Custody Deaths (IPICD) in excited delirium cases:

40.1.  Death can follow bizarre, agitated behavior episodes when the person suddenly appears calm.  This is why excited delirium cases should at all times be considered a medical emergency.

Pre-disposing factors include but are not limited to:

40.2.  Use of methamphetamine

40.3. Head injury (prior or current)

40.4. Underlying Psychiatric disease

Psychological Behaviors include but are not limited to:

40.5. Extreme agitation

40.6. Disorientated about place, time, purpose

40.7. Psychotic in appearance

Communication Behaviors include but are not limited to:

40.8. Talking to invisible people

40.9. Irrational speech

Physical Behaviors include but are not limited to:

40.10. Bizarre behavior

40.11. Aggression toward inanimate objects (for example, banging the head against the car door and banging the walls of a cell)

40.12. High body temperature

40.13. Being naked to get cool

40.14. Muscle rigidity

40.15. Profuse sweating

40.16. Shaking and shivering (tremors)

40.17. Respiratory distress

**Failure to provide emergency medical care for the decedent was below the standard of care:**

41. Based on what was known to the Eureka officers, failing to provide immediate emergency medical care to the decedent at the time of his arrest was

unreasonable and inconsistent with accepted police training and standards (including POST).

**The officer pulls into the vehicle entrance of the jail:**

42. At about the 7 minute mark into the video Officer Stelzig pulls into the jail's entrance. The video shows the decedent sitting in the rear seat for about 7 minutes.

    42.1.   The rear seat dash camera video shows the arrival at the jail's vehicle entrance. When Officer Stelzig pulled up to the intercom, I heard him tell the person inside, "I got a male, not combative, but amped up – like meth'ed out." The person inside replied, "Ok, I'll let them know."

    42.2.   During this time, the decedent's condition gets worse. The decedent continues to nod off and then starts banging his head on the passenger door. He stops banging his head at one point and has a very angry look on his face.

        42.2.1.    He is sweating heavily and is talking to himself.

    42.3.   At 9:04 minutes in to the video his breathing appears to be labored as evidenced by the forceful and rapid intake of breath.

43. Whenever an officer arrives at a jail with a prisoner, the officer must always monitor them closely until the jail staff accepts the person into their custody.

    43.1.   The arresting officer is always responsible for their prisoner's welfare until the prisoner is accepted into the custody of the jail. This is a POST custody standard. Not properly monitoring the prisoner and failing to react to what is clearly a medical emergency is unreasonable and below POST standards.

    43.2.   Based on the decedent's obvious medical emergency, any professionally trained, POST certified, reasonable officer ought to have reacted reasonably and called for the jail medical staff to respond at once. This was not done.

44. Officer Stelzig stated on page 75 of his deposition that at the jail he rolled the windows down because "...he was profusely sweating."

    44.1.   Officer Stelzig stated on page 87 that he told the jail staff the decedent was "highly under the influence."

45. Officer Goodale drove in and parked next to Officer Stelzig at the jail. Officer Goodale stated in his deposition on page 13 and 15 that he asked the decedent to step out of the car. Officer Goodale stated, "He had a lot of sweat running down him. He was rigid and fidgety."

   45.1. On page 19, Officer Goodale stated the decedent was taking "deeper breaths."

## What is seen on the jail video – vehicle parking area:

46. Time shown was taken from the jail's video time stamp and video and what is seen on the video:

| Time | What is seen on video in the vehicle parking area of the jail. |
|------|----------------------------------------------------------------|
| Unkn | The police car pulls in to the jail. The jail video does not show the time of the vehicle entry.<br><br>The timeline taken from the rear seat camera shows from the time of arrival at the jail parking spot to the time the decedent was taken out of the police car was about 6.5 minutes.<br><br>During this time the decedent's condition worsened. The decedent is sweating more and more, and his level of agitation has increased. He is nodding off at times and at times bangs his head on the door window. |
| 1423 | The decedent and the officer walk from the police car to the rear jail entrance door. The decedent staggers. The decedent then sits down in a chair outside of the door. |
| 1427 | The decedent looks to be nodding off at 14:27:57. He is also seen wiping his forehead on his knee. |
| 1434 | The rear door is opened and the decedent and officer enter. |

47. Officer Stelzig brings the decedent into the jail and is then turned over to the care of the jail staff.

## Eureka Chief of Police Mills' deposition:

48. Chief Mills stated on page 13 of his deposition that he reviewed the reports and the videos of the arrest and stated that he is "...very comfortable with our behavior and our procedures during that incident."

49. On page 27, the chief stated "Not that I'm aware of" when asked if there was any training that the city requires officers to complete regarding when they should obtain medical clearance of arrestees."

50. On page 31 the chief stated he was not aware of any article distributed to officers regarding certain issues, such as conditions of a medical nature that should lead to people being taken for medical clearance.

51. On page 33 the chief stated there is no excited delirium training.

52. On page 35 the chief stated the officers receive methamphetamine overdose training in the basic academy.

**The decedent's intake at the jail:**

**What is proper, reasonable, and best police practice to ensure the safety and health and welfare of the decedent at the jail which is the second location:**

It is the best practice for the jail officers and medical staff to:

➢ speak with the arresting officer to receive as much information as possible about the details of the arrest, about the arrestee's medical and mental condition, and whether the arrestee had any physical and/or mental changes during transport to the jail

➢ follow all policies and procedures designed to ensure the safety and health and welfare of inmates during the intake as well as during their housing

➢ refuse to accept a booking from patrol officers in accordance with the jail's policy and procedures where appropriate

➢ follow first aid training and react when the arrestee is in need of emergency medical care and treat as a medical emergency

➢ follow Title 15, Jail Minimum Standards, Medical Care, and see to it that prisoners in medical distress receive prompt emergency medical attention

➢ follow jail policy regarding the conducting of proper safety checks and see to it that prisoners in medical distress receive prompt emergency medical care

➢ ensure the medical staff properly responds to the pre-booking area to personally assess the inmate's medical condition according to the requirements of the policy and procedures before the inmate is taken to his/her cell

> try to calm the inmate and reassure them, using minimal restraints, to gain their cooperation and trust so medical care can be delivered. If the inmate cannot be calmed then quickly restrain and if possible sedate an inmate who is displaying signs and symptoms consistent with being in a state of excited delirium or an agitated chaotic event and then transport the inmate to the hospital at once via paramedics

> err on the side of caution and summon emergency medical care to ensure the safety of the inmate, even if medical help is offered but refused, and even if the arrestee does not ask for medical help

**Important case related jail policies and procedures:**

53. The Humboldt County Correctional Facility has policies and procedures designed to ensure the safety of the staff and inmates.

   53.1.  No matter how well written, easy to understand, and easy to follow polices and procedures are, they are meaningless if they are not followed.  The evidence shows the following jail policies were not followed.

**Pre-booking Procedures policy:**

54. The jail's Pre-Booking Procedures policy, exhibit 1, Bittner deposition, states in part on page 5, procedure number B-001, under <u>Uncooperative</u> Arrestee or Arrestees Displaying Violent Behavior, section 3:

   54.1.  "Facility health care services staff <u>will</u> be called to assist in completing the Medical Pre-Screening. If a proper assessment and/or vital signs cannot be obtained, the arrestee <u>will be refused</u> pending medical clearance from the hospital."

**Medical Receiving Screening:**

55. The jail's Medical Receiving Screening policy, number H-002, exhibit 1, Bittner deposition, states in part on page 5, procedure number B-001, under General Information, section 6:

   55.1.  "Arrestees with the following symptoms or conditions require medical clearance <u>prior to being accepted</u> for booking:

      55.1.1.    Having convulsions (the decedent had body tremors and was shaking at times)

55.1.2.    Shows any signs of a head injury (I do not know if Officer Stelzig informed the staff about the decedent hitting his head on the ground at the arrest site, but a reasonable officer would have done so).

55.1.3.    Having a lot of trouble walking (as evidenced in the video)

55.2.    "The facility health care services staff may identify other symptoms or conditions that require medical clearance at an emergency room prior to acceptance for booking."

55.2.1.    Under the evidence of this case, had a reasonable nurse personally examined the decedent in the booking area <u>before</u> he was placed in the sobering cell as required, the reasonable nurse would have been able to evaluate the decedent's poor mental and physical condition.

**Identification and handling of Mentally Disordered Inmates:**

56. The jail's Identification and Handling of Mentally Disordered Inmates policy, number H-102, item 18, states in part on page 3, under General Information, section 4:

56.1.    "Arrestees who appear to be mentally disordered at intake <u>shall</u> require medical clearance <u>prior</u> to acceptance for booking.  Facility health services staff <u>shall</u> be called to the pre-booking area to assess the medical and mental condition of the arrestee."

56.1.1.    According to this policy, mentally disordered means in part a person who is "gravely disabled by virtue of a suspected or diagnosed mental illness."

56.1.2.    Since the decedent was not oriented to self, date, time, and place, coupled with his bizarre, agitated behavior in the booking area and the fact that the decedent was known to the jail staff to be mentally ill, the decedent for the purposes of this policy fits the description of being mentally disordered.

**Sobering cell policy:**

57. The jail's sobering cells policy, number B-007, item 18, section 9, states in part:

57.1.   "To be placed in a sobering cell the arrestee must be able to be aroused, able to respond to simple commands, have no difficulty breathing, not appear to be acutely ill, and able to walk to the cell with minimal assistance.  When in doubt...staff shall obtain an assessment from the Health Services staff as soon as possible prior to placement in the sobering cell."

57.2.   Section 10 stated in part: "The shift supervisor shall ensure that Health Services staff is notified immediately when an inmate is placed in a sobering cell."

57.2.1.    There is no evidence that Supervising Correctional Deputy Hershberger made this notification.

**The Sobering Cells – Custody's Role Policy:**

58. The Sobering Cells – Custody's Role Policy, item 19, Humboldt County Adult Policy and Procedures Manual, page 221, section 6, states:

58.1.   "All inmates in the sobering cell will be checked by medical staff when admitted to the cell and every four hours thereafter."

58.1.1.    The video evidence shows the nurse responded to the sobering cell about 19 minutes after the decedent was admitted to the cell.

**The jail officers' training:**

59. The provided training records, item 17, show that jail personnel Bittner, Hammer, and Hershberger all had received first aid training, sobering cell training, jail medical issues training, and medical receiving screening training. Officer Swim received Emergency Medical Technician, EMT, but not medical issues training.

59.1.   Because all of the involved jail officers had been trained in the above listed areas, they ought to have known that due to the decedent's poor physical condition, his known mental illness, his bizarre, agitated, and uncooperative behavior, the jail nurse should have been present to assess him.

59.2.   These same officers also ought to have known that according to the above policies the decedent should not have been accepted at the jail until medically cleared at a hospital.

60. Supervising Correctional Deputy Hershberger stated in his deposition on pages 17, 18, and 19, that the first aid training the officers received is STC accredited.

    60.1.   Supervising Correctional Deputy Hershberger stated that some of his training had been in excited delirium; however, that training is called medical issues training. Supervising Correctional Deputy Hershberger stated that training is done with "...our contracted medical provider...." When asked if the medical issues course was led by somebody from CFMG, he stated, "Yes."

    60.2.   When asked if the training he received in the medical issues course covered excited delirium as a medical emergency, he replied, "Yes, I do recall that."   When asked if someone is in a state of excited delirium should emergency medical care be summoned?  He replied, "Yes."

61. Since jail personnel Corporal Bittner, and Officer Hammer all had received jail medical issues training, it makes sense that Corporal Bittner, and Officer Hammer would have also been trained about excited delirium and that excited delirium is a medical emergency.

**Adult Corrections Officer Core Course for Standards and Training for Corrections Program, STC:**

62. It is my understanding the jail officers attended the Adult Corrections Officer Core Course for Standards and Training for Corrections Program, STC. That training included these areas:

    62.1.   Adult Corrections Officer Core Course, unit 9.0, Booking and Receiving, module 9.1, receiving inmates, instructional objectives, section 9.1.1, in part states, "...identify the correct procedure for receiving inmates including the following steps "...screen to determine if medical attention is needed (e.g., physical condition, appears under the influence or undergoing withdrawal), screen to determine if placement in the detox/sobering cell is needed...."

    62.2.   Adult Corrections Officer Core Course, Unit 12.0, Report Writing and Record Keeping, module 12.1, in part states, "Organization and development of the report, inclusion of relevant information...is the description of the incident accurate (this includes log sheets), are all the elements of the incident articulated appropriately?"

    62.3.   Adult Corrections Officer Core Course, Unit 15.0, Monitoring Psychological and Physical Health, Title 15 mandates regarding the

medical and psychological treatment of prisoners, and potential liability for noncompliance. Mental Health Issues in part states, "Identify the following potential signs of mental health issues in inmates: withdrawals, bizarre behavior...a noticeable change in established behavior, mentally disordered, use of psychotropic drugs...."

62.4.   Adult Corrections Officer <u>Knowledge and Skills</u> Map, Map 1.00, in part states:

    62.4.1.   "...Obtain information from transporting/arresting officers and inmates for intake purposes."

    62.4.2.   "Screen inmates to determine if medical attention is needed."

    62.4.3.   "Refuse to take custody when necessary."

    62.4.4.   "Detecting medical problem signs: tremors, unusual verbal responses, physical injury, unusual motor behavior, appears to be under the influence, appears to be or likely to be undergoing alcohol or drug withdrawal, sweating, agitation, anxiety, disorientation, hallucinations..."

**Adult Correctional Officers Knowledge Skills Map:**

62.5.   Report writing, Map 3.03, in part states, "Be accurate, be objective, be clear, concise, honest, and specific."

62.6.   Accompany Medical Staff, Map 8.01, in part states, "Accompany doctors or nurses during their medical rounds or visits to inmates."

62.7.   Indentifying and monitoring inmates for medical problems, Map 8.04, in part states, "Screen inmates to determine if medical attention is needed."

**What is seen on the jail video — once inside of the jail:**

63. To better understand what occurred inside of the booking area and inside of the sobering cell, here is the description of the jail video. Time shown was taken from the jail's video time stamp:

| Time | What is seen on video from the time the decedent entered the jail booking area and was taken to his cell to the time CPR was administered to him. |
|------|-----------------------------------------------------------------------------------------------------------------------------------------------|
| 1434 | The decedent enters and tries to stand by a wall. The decedent is |

|   | staggering and cannot stand still. He stumbles and almost falls over.<br><br>At 14:35:35, he begins to bang his forehead into the wall about 4 to 5 times. He then staggers around and rolls along the wall.<br><br>At 14:36:35, the decedent is searched by a female, Corporal Bittner, and male jail officer, Officer Swim. At 14:38:25, a third officer, Officer Hammer, helps with the search. It looks as if the officers are having a difficult time controlling the decedent. The officers are holding him up against the wall during the search. Corporal Bittner has her right leg back as if bracing herself and using leverage to hold the decedent up against the wall. While the officers did use this force to control him, the force they used appeared reasonable and necessary. It was not excessive.<br><br>During the interactions with the officers, at no time did I see the decedent turn his head and nod at an officer or acknowledge an officer as if responding to questions.<br><br>When the decedent turned his head away from the wall, the decedent is pushed back against the wall. The decedent's actions are consistent with being uncooperative and not obeying commands.<br><br>From the time the decedent was first approached and patted down at 14:36:35, to the time he was escorted, with a lot of help, to the sobering cell at 14:39:16, 2 minutes, 41 seconds had elapsed. |
|---|---|
| 1439 | The decedent needed a lot of help to walk to his cell with two to three officers holding him up. He was staggering as he walked. Based on how he was staggering if the officers did not hold him up, he would fall over.<br><br>His sweat had soaked into the upper chest area of his shirt.<br><br>The video shows at no time did a nurse examine (taking his vital signs, etc.) the decedent during this time.<br><br>From the time the decedent entered the booking area of the jail until the time he was placed into the sobering cell was about 5 minutes. |
| 1439 | **The decedent enters the sobering cell.** The officers bring him in and carefully put him on his knees then carefully lower him face down to remove his handcuffs.<br><br>The log shows the decedent was placed the cell at 1440 hours. Officer Hammer made the log entry. |

| | |
|---|---|
| 1439 - 1444 | During this time, the decedent is quite agitated. He is seen bouncing off of the walls, taking his clothes off, takes water out of the toilet and brings it to his face, cooling himself off with toilet water, rolling around on the floor, hitting the walls with his fists as he is getting more and more agitated, and sitting next to the toilet with his head in his hands looking sick. He is shaking. |
| 1444 | An officer is seen walking up to the cell, writing on the log and leaving. It is possible this was the entry where the officer logged "placed" as this entry was four minutes after the decedent was placed in the cell. Officer Hammer made this entry. |
| 1444 – 1454 | The decedent takes water out of the toilet and brings it to his face, mops the floor with his clothes, slaps the walls, tosses his clothing up to the camera and in front of the door as if to get someone's attention. He is seen banging on the cell door and window and looking out. (I have years of jail experience. His actions are consistent with trying to call for an officer.)

The decedent is flopping around the floor naked. The decedent is fanning himself to cool off. He appears more agitated and more distressed. He is holding his head in his hands as if crying.

The decedent washes his groin with his toilet soaked clothing. He kicks the privacy wall a few times. He demonstrates aggression toward this wall. His agitated behavior is bizarre.

He is face down. His legs tremble and twitch. The decedent is on his knees doubled over looking sick.

During this time, on another camera view, an officer can be seen watching the video monitor from the work station. I cannot tell if the officer is watching the decedent. If the officer is watching, he did not react to what was seen. |
| 1454 | The **first safety check** shown in the video is performed. Officer Hammer spends time looking in at the decedent. Officer Hammer logged "moving " under observations.

The video shows Officer Hammer's face was about 6 to 12 inches from the window when he looked inside.

The decedent was moving. He was naked on his back rolling around in the cell. At one point he curled up into a fetal position then onto his back while flailing his legs.

A reasonable officer would have contacted the decedent to see if he |

| | |
|---|---|
| | responds and ascertain if he was alright.<br><br>A reasonable officer in Officer Hammer's place would have reacted to the decedent's bizarre agitated behavior and called the nurse to assess the decedent.  Officer Hammer signs the log and leaves.<br><br>When Officer Hammer walked by the officer work station after the check he stopped, leaned over the desk, and had a conversation with Corporal Bittner and another officer for about 20 seconds.  While I do not know what was said, a reasonable officer would have informed these two about what he had seen the decedent doing during the check.<br><br>Because Officer Hammer did not summon the nurse, or at least ask the decedent if he was alright and see if the decedent responds, this **first safety check was improper and out of policy.** |
| 1454 - 1458 | The decedent continues to roll around on the floor. |
| 1458 | **Nurse arrives at the cell**.  A nurse walks up and looks at the log. She then signs the log.  The nurse looks into the cell.<br><br>While she is looking in, the decedent is climbing over the privacy wall and is waving his leg and clothes.<br><br>The decedent has his wet clothes in his mouth and is bent over the privacy wall and looks sick.  The decedent curls up into a fetal position by the door, looks to be shaking and holding his stomach, and looks as if he is sick while the nurse is looking in.<br><br>The video shows the nurse's face was about 1 foot to 2 feet from the window when she looked inside.<br><br>The nurse does not physically come in contact with the decedent to evaluate him.  I cannot tell if the nurse is trying to trying to talk with the decedent.  The nurse then walks away.  There is no evidence the nurse taking any action to further assess the decedent.<br><br>I am not evaluating the nurse's inaction.  A medical expert will. |
| 1458 - 1508 | The decedent continues to roll around on the floor.  He lies by the toilet.  He is slowing down in his movements.  He crawls face down to the door.  The decedent has not stood up in sometime. |
| 1507 | The **second safety check** shown in the video is performed.  The decedent is laying by the door moving around on his back.  Officer Hammer looks in, signs the log and leaves.  The log shows "moving / |

| | |
|---|---|
| | on back." While the decedent is on his back, he is rolling his legs up to his head, and then curls up on his left side and holds his stomach as if sick. The decedent then stands and bends over the privacy wall. |
| | The video shows Officer Hammer's face was right up at the window when he looked inside. |
| | A reasonable officer would have contacted the decedent to see if he responds and ascertain if he was alright. |
| | A reasonable officer in Officer Hammer's place would have reacted to the decedent's bizarre agitated behavior and called the nurse to assess the decedent. Officer Hammer signs the log and leaves. |
| | Because Officer Hammer did not summon the nurse, or at least ask the decedent if he was alright and see if the decedent responds, this **second safety check was improper and out of policy.** |
| 1508 - 1521 | The decedent moved to the right side of the cell and lays on his left stomach/hip. |
| 1521 (time stamp) 1519 (on log) | The **third safety check** shown is performed. The decedent is laying on his left side with his right leg laying over his left. He does not appear to move. Officer Swim looks in for 2.6 seconds (on a stop watch), signs the log and leaves. |
| | The 2.6 seconds is not enough time to see if the inmate is in medical distress. |
| | The video shows Officer Swim's face was about 2 feet from the window when he looked inside. |
| | Given the position of the decedent, seeing his chest and stomach from the cell window would be difficult as best. |
| | Officer Swim wrote on the log, "left side breathing." What Officer Swim logged is not what is seen on the video. |
| | If the inmate appears to be sleeping, a reasonable officer would log that observation along with the inmate's body position. |
| | A reasonable officer would have contacted the decedent to see if he responds and ascertain if he was alright. |
| | This **third safety check was improper and out of policy.** |
| 1521 – | The decedent is laying on his left side with his right leg laying over his |

33

| | |
|---|---|
| 1534 | left.  I have not seen the decedent move since about 1517 hours. |
| 1534 (time stamp) 1531 (on log) | The **fourth safety check** shown is performed.  The decedent is laying on his left side with his right leg laying over his left.  He does not appear to move.<br><br>Officer Rogers glances in the cell as he walks by to the log sheet which he logged, "on stomach OK."  Officer Rogers spent less than 1 second looking in on the decedent.  That is not enough time to see if the inmate is in medical distress.<br><br>The video shows Officer Rogers was about 2 to 3 feet away from the window when he glanced in.<br><br>This **fourth safety check was improper and out of policy.** |
| 1547 (time stamp) 1545 (on log) | The **fifth safety check** is performed.  Officer Swim looks in for about 2.3 seconds (on a stop watch), signs the log and leaves.  The same circumstances were present in this check as in Officer Swim's 1521 hours check.<br><br>Officer Swim wrote on the log, "on stomach – breathing." What Officer Swim logged in not what is seen on the video.  (Inconsistent with Swim's log at 1519 hours.)<br><br>The video shows Officer Swim's face was about 1 foot from the window when he looked inside.<br><br>The decedent had not moved since the third safety check.<br><br>Officer Swim's check was only 2.3 seconds which was too short a time to have conducted a proper check to determine if the inmate was in medical distress. This **fifth safety check was improper and out of policy.** |
| 1547 - 1600 | The decedent is not moving. |
| 1600 | The **sixth safety check** was started.  Officer Hammer looks inside for about 20 or so seconds, signs the log, and leaves.  He walks down the hall a few steps, stops, and returns to the cell.<br><br>When Officer Hammer looked in, his face was inches from the window.<br><br>Officer Hammer looks in again and appears to summon the help of another officer. Once there are two officers, the door is opened, and the officers go inside and find the decedent unresponsive. |

| | One officer moves the decedent's foot with his own foot then bends down to check the decedent. After a few seconds the officer call for help and help arrives and CPR is started. This **sixth safety check was proper.** |
|---|---|
| 1608 | The Fire Department arrives and about two minutes later the ambulance also arrives. |
| -------- | The evidence shows that 83% of the safety checks were performed improperly, in violation of jail policy and Title 15, section 1027 and 1056. |

64. Supervising Correctional Deputy Hershberger stated the decedent walked to the sobering cell under his own power (page 46 of the deposition). The video evidence shows the decedent had a lot of trouble walking and needed a lot of help to walk.

64.1.  This information is important. The sobering cell policy in part states, the person must be "...able to walk to the cell with minimal assistance. When in doubt...staff shall obtain an assessment from the Health Services staff as soon as possible <u>prior</u> to placement in the sobering cell."

64.2.  A reasonable supervisor in Supervising Correctional Deputy Hershberger's position would have had the decedent checked by the nurse prior to placement in the sobering cell, as required.

## **Quality of sobering cell checks:**

65. To better understand how jail safety checks must be performed, it is important to know what "direct visual observation" really means. To comply with the jail policy and Title 15, sections 1027 and 1056, the officer must be in a position to actually see the inmate to determine if the inmate is alive, etc. The use of video monitors is permitted to enhance the efforts to keep inmates safe, but the video monitors are never to replace actual "eyes on" of the inmate. Conducting a video safety check does not count as a check and is in violation of jail policy and Title 15, sections 1027 and 1056.

65.1.  According to Title 15, section 1027 regulations, there shall be enough jail personnel on duty to visually check that every inmate is *alive* and not experiencing any *medical* trauma at least once an hour. According to Title 15, section 1056 regulations, Use of Sobering Cell, direct visual checks of inmates shall be no less than every half hour.

65.2.  Ms. Rebecca Craig, Field Representative, Facilities Standards Operations, Board of State and Community Corrections reaffirmed this to me on March 14, 2014. In fact, she stated the safety checks are to be

"eyes on" safety checks. The regulation states "direct visual supervision...." She reiterated this means the jail staff (officers) must see skin and confirm that the inmate is breathing. Keep in mind that the jail's own policy for safety checks states that each inmate will be observed.

65.3.  Steve Keithley, Field Representative, Facilities Standards Operations, Board of State and Community Corrections told me on July 1, 2015, that the safety check requires "direct, visual" observation.  "If there are obstructions, then the distance and obstructions between the officer and inmate may prevent "direct" observation."

65.3.1.    Under the evidence in this case, the sobering cell's privacy wall is such an obstruction.

66. When the sobering cell safety checks are conducted they must be properly completed.  When safety checks are conducted they must be by direct visual observation in accordance with jail sobering cell policy and in accordance with Title 15, section 1056, Use of Sobering Cell.

66.1.  According to the jail's sobering cell policy, B-007 and the jail's safety check policy F-018, item 41, for sobering cell, the purpose of the Direct Visual Observation requirement "...is to allow officers to physically see and hear if an inmate is OK and not having difficulty breathing while in the sobering cell."

66.2.  Further, the policy states inmates in the sobering cells "shall be carefully observed as required, so any deteriorating condition or life threatening situation can be referred to heath services staff."  The Safety Check sobering cell policy, F-018, also states in part when logging the observation, "The observation noted shall reflect the *specific physical activity* presented by the inmate."

66.3.  When the safety checks are conducted, the officer conducting the check must log the time of the check and their observations at the time of the check.  It is important for the officer conducting the safety check to do so accurately.  This means whatever the officer sees the inmate doing at the time of the check must be accurately reflected in writing in the Observation Log.

66.4.  It is not only unreasonable and a violation of jail policy to perform improper safety checks, it is also dangerous to the inmate if the inmate suffers a medical emergency because no one would know.

66.5.  The decedent's sobering cell has a privacy wall next to the toilet. These privacy walls are common in jails.  Reasonable officers must be aware that if the privacy wall hinders the requirement of direct visual observation if the inmate is behind the wall, a reasonable officer will instruct the inmate to move into his view.  If the reasonable officer cannot get the inmate to respond to his command, the reasonable officer, with back up, will enter the cell to check on the inmate.

66.6.  In a case wherein an inmate does not respond to the officer's commands, besides the reasonable officer getting back up to go inside, the reasonable officer would also call for the nurse to respond out an abundance of caution.  The whole purpose of the safety check is ensuring the health of the inmate.

66.7.  According to Supervising Correctional Deputy Hershberger, due to the layout of the cell, if an inmate is behind the privacy wall, the inmate cannot be seen from the outside of the cell window (depo page 30 and 31).

66.8.  When an officer simply walks by the sobering cell and does not look inside or takes a passing glance, and/or when an officer sees the inmate doing one thing yet logs something else, that officer's actions are unreasonable and in violation of policy.

66.9.  If an officer conducting the safety check fails to actually observe the inmate yet signs the log stating he had, etc., then not only did this safety check not benefit the inmate, but the officer falsified the log which is an official document.

66.10. The evidence shows, as listed in the above video matrix, all of the cell safety checks, except for the last one, were in fact done improperly. What is seen on the cell video is inconsistent with what is logged on the Observation Log.

**The decedent's sobering cell window was reportedly difficult to see through:**

67. As discussed toward the end of my report in the After Action Review, item 35, Officer Wibbenhorst and Corporal Bittner both stated that the windows in the sobering cell are very hard to see through.  Corporal Bittner stated the scratches on the window make it difficult to see inside.

68. Supervising Correctional Deputy Hershberger stated in his deposition on page 29 that when asked if you can see the inside of the cell a few feet back from

37

the window.  Supervising Correctional Deputy Hershberger stated, "...you generally have to go pretty close to see the entire cell.  Because if you look at the height of the window, you have to actually go up to the window to see the entire cell."

68.1.  In the sobering cell video matrix above I described the approximate distances between the window and the officers and nurse who conducted the checks.

## The intervention window to get emergency medical help to the decedent:

69. From the time the decedent entered the jail at 1434 hours to the time he was found unresponsive by the two officers at about 1600 hours, the staff had the opportunity to get the decedent help for what should have been an obvious medical emergency during this approximate 1 hour and 26 minutes.

## What was seen by the officers on the cell video camera monitor:

70. Corporal Bitter stated in her written report, item 8, that once the decedent was in his cell, she went to the Officer's Station and then watched on the monitor the decedent taking off all of his clothes, rolling around in the cell, soaking his clothing in the toilet, spinning in circles on the floor, and trying to flood the cell.

70.1.  Corporal Bittner did not go and check on the decedent or go and see about the cell flooding.

70.1.1.    Later in her deposition, she stated she did not recall responding to the flooding.

70.1.2.    The decedent's highly agitated bizarre behavior is consistent with excited delirium.

70.1.2.1. At this point in time, it would have been appropriate to summon the nurse to check on the decedent.

70.2.  Not immediately checking on the decedent's welfare and not immediately calling for the nurse to respond is unreasonable and inconsistent with accepted police and jail training and standards.

70.3.  Additionally, not immediately going to stop the reported cell flooding is unreasonable and inconsistent with accepted police and jail training and standards.

38

70.3.1.    I know from years of jail experience that when an inmate floods his cell, the flooding can cause significant facility disruption during the clean up.  It makes no sense that Corporal Bittner would report the flooding attempt but not take any action.

71. On page 113 of Corporal Bittner's deposition when she was asked about her observation of the decedent sleeping (from watching the monitor), she explained that she told other officers, "Finally, he laid down."

71.1.  As stated in this report, death often follows bizarre, agitated behavior episodes when the person suddenly appears calm.  This is why excited delirium cases should at all times be considered a medical emergency.

71.2.  When Corporal Bittner saw that the decedent had "finally laid down" apparently sleeping, the reasonable action to take would have been to quickly check on the decedent to ensure he is alright.

72. Officer Swim stated in his written report, item 8, that once the decedent was in his cell, "...from then on" we saw the decedent move around his cell and take his clothes off.

72.1.  Officer Swim's report does not state he saw this on a monitor; however, the evidence shows he must have done so.  Officer Swim wrote that he conducted a cell check at 1545 which he logged in the observation log.  So it makes sense that Officer Swim had to have seen the decedent's actions on a monitor.

72.2.  Officer Swim did not go and check on the decedent even though the decedent was showing signs of agitation and distress and needed to be checked on.

72.3.  Not immediately checking on the decedent's welfare and not immediately calling for the nurse to respond is unreasonable and inconsistent with accepted police and jail training and standards.

73. Supervising Correctional Deputy Hershberger stated in his deposition on page 11 that he does recall seeing the decedent in his cell while watching on the video monitor.

73.1.  Supervising Correctional Deputy Hershberger stated on page 46 of his deposition that he saw the decedent taking off his clothing, wetting it and swinging it around.  A reasonable supervisor, especially a reasonable supervisor who had had excited delirium and medical issues training,

==coupled with what was observed during the decedent's intake would have quickly checked on the decedent and called for the nurse to respond to check as well.==

## The jail personnel's actions:

## Officer Swim:

74. Officer Swim was the first jail officer to come in contact with the decedent. Officer Swim stated in his deposition on page 22 that he and Corporal Bittner conducted the pat down search of the decedent in the booking area as seen on the video.

   74.1.  On page 46 of Officer Swim's deposition he stated the medical staff was notified of the decedent's arrival; however, Officer Swim does not know who made that notification.

   74.2.  Officer Swim was asked on page 34 if the decedent was compliant or not.  Officer Swim stated, "He was passively resistant."

      74.2.1.    Reasonable officers know passively resistant typically means the person does not respond to verbal commands.

   74.3.  On page 24 Officer Swim was asked if the decedent was oriented to self, date, time, and place.  Officer Swim replied that when the decedent first came in he was not; however, after the decedent was asked questions, "...he would talk to us or nod."

      74.3.1.    Officer Swim was asked why the intake medical questionnaire form, item 7, was marked with "No?"  Officer Swim stated he does not know why.

      74.3.2.    On page 25 Officer Swim was asked if based on his training and experience if the form states "No" to whether the decedent was oriented to self, date, time, and place, that was his status at the time the entry (into the form) was made.  Officer Swim stated, "Yeah. Yes, at the time that entry was made."

   74.4.  When Officer Swim was asked on page 51 why the decedent was not given the opportunity to review and sign the medical intake booking observation form, Officer Swim replied, "Because he was having a hard time following directions."

74.4.1.    On page 52 Officer Swim stated, "He was passively resistant so he was placed into the sobering cell."

74.4.1.1. On page 131, Officer Swim stated he did not know who made the decision to place the decedent in the sobering cell.

74.5.  On page 109 of his deposition, Officer Swim stated he did write in his report, "Due to his resistance Corporal Bittner asked for an additional officer to help with pat-down."

74.5.1.    When asked if the decedent was resistive, Officer Swim stated, "With his difficulty following directions and his movements, and constantly moving around, yes."

74.6.  On page 74 Officer Swim was asked if he would classify the decedent as being uncooperative, Officer Swim stated, "Yes."

74.7.  Officer Swim stated on page 100 when he was asked if nurses can see someone in the booking area when there are other officers present before the person goes to the sobering cell, Officer Swim stated, "It is a possibility, yes."

74.8.  Officer Swim explained on page 105 that once the officers entered the cell to check on the decedent, it was Corporal Hammer who tapped the decedent's foot to get him to respond.  Officer Basler was at the door.  Corporal Bittner retrieved the oxygen.  Officer Corral did chest compressions.  And Officer Swim held the door open.

75. Based on Officer Swim's testimony, the decedent was uncooperative, resistive, and did not respond to and/or follow commands.  The decedent should never have been placed in the sobering cell unless the medical staff first assessed the decedent in the booking area per policy.  Officer Swim should've had the training to have known this.

## Corporal Bittner:

76. Corporal Bittner stated on page 61 of her deposition that she knew the decedent suffered from a mental illness from her prior jail contacts with him.

76.1.  On page 74 when asked if she saw the decedent sweating profusely, she stated she did not recall.  When asked about the temperature in the booking area she stated it was about "68 to 70 degrees."

76.2.   Corporal Bittner stated on page 96 when asked if anyone called the medical staff to come to the booking area, she stated, "No" and added "there was no discussion either."

76.3.   On page 69, Corporal Bittner stated, "He just wouldn't respond to questions."

76.4.   Corporal Bittner agreed on page 77-78 that a third officer was needed (during the pat-down in the booking area) because of the decedent's "unpredictability and clenching his fists."

77. Based on Corporal Bittner's testimony, the decedent had a known mental illness and fit the description of being mentally disordered, was uncooperative, did not respond to questions, and was (showing signs of pre-assaultive behavior) clenching his fists.  The decedent should never have been placed in the sobering cell unless the medical staff first assessed the decedent in the booking area per policy.  Corporal Bittner had the training to have known this.

78. Supervising Correctional Deputy Hershberger stated on page 40 of his deposition when asked if he observed the medical questions being asked of the decedent, on the date of this incident, he replied, "No."

78.1.   Since Supervising Correctional Deputy Hershberger did not observe the medical questions being asked, a reasonable supervisor would have gone and checked to see if in fact the questions were asked and answered.

**Nurse Hampton:**

79. Nurse Hampton checked the decedent during the one nurse cell check at 1458 hours.

79.1.   Nurse Hampton stated on page 67 of her deposition that when she made her cell check, there was no need to call the staff to open the door because the decedent was "not in distress."

79.1.1.    According to what is seen on the cell video when Nurse Hampton was looking in, this is what she would have been in a position to see:

79.1.1.1. The decedent is climbing over the privacy wall and is waving his leg and clothes at the nurse as if to get her attention.

79.1.1.2.  The decedent has his wet clothes in his mouth and is bent over the privacy wall and looks sick.

79.1.1.3.  The decedent curls up into a fetal position by the door and looks to be shaking while the nurse is looking in.

79.2.  Nurse Hampton stated on pages 84-85 that she is trained if someone had symptoms of distress, then "we can go in and evaluate them."

79.3.  Nurse Hampton stated on pages 104 -105 that:

79.3.1.    She did not talk to anyone about going into the cell to check on the decedent.

79.3.2.    She determined his level of orientation by "observation."

79.3.3.    She did not ask anyone how the decedent acted in pre-booking.

79.3.4.    She stated no one asked her to talk with the decedent.

79.3.5.    She stated the way he was acting or presenting in the sobering cell was "probably pretty much the way he was presenting in pre-book."

79.3.5.1.  Nurse Hampton had no way of knowing how the decedent presented in the booking area since she was not present and did not ask.

79.4.  On page 118 Nurse Hampton stated she did not take the decedent's vitals and did not ask the officers to respond to see if there was a safety issue to be able to try to take the vitals.

79.4.1.    Exhibit 1 of Nurse Hampton's deposition is CFMG's Sobering / Safety cell / Restraints Log.  Under the Assessment portion dated June 13, 2014, at 1500 hours, in the area for recording the vitals of the patient, Nurse Hampton wrote "Refused."

79.4.1.1.  Based on the evidence, Nurse Hampton did not attempt at all to take the decedent's vitals.

**Corporal Hammer:**

80. Corporal Hammer explained on page 37 of his deposition that the sobering cell has an audio sound activated monitor.  When it is activated by sound

coming from the cell, the display screen in the officers' desk area, called the "horseshoe," is activated.

    80.1.  There is no evidence of any officer reacting to either hearing the decedent inside the cell or seeing the decedent's distress on a monitor.

81. On page 45 Corporal Hammer was asked a series of questions.  He was asked if he remembered the decedent in the intake area?  Did he help with the decedent's intake?  Does he remember going into the intake room?  Does he remember patting down the decedent?  Does he remember who made the decision to put the decedent in the sobering cell?  Does he remember walking the decedent to the sobering cell?

    81.1.  To all of these questions, Corporal Hammer replied he did not remember.

        81.1.1.    However, he does remember holding the sobering cell door open.

## Mr. Robert Eury:

82. Mr. Robert Eury is the program manger for medical services at the jail.  It is his responsibility to ensure polices and procedures of medical services at CFMG are kept current, page 24 of his deposition.

    82.1.  Mr. Eury stated on page 28 that the CFMG trains officers about what medical issues they should be aware of and when to call for medical services to respond.

    82.2.  On page 52 Mr. Eury explained that typically before a nurse goes to the sobering cell to check on an inmate, the nurse would first try to get additional information about the inmate.  There is no evidence this was done.

    82.3.  On page 77 Mr. Eury explained if a nurse was unable to enter a cell for whatever reason to assess an inmate, the nurse would want to talk with an officer involved in pre-booking to get more information.  Mr. Eury stated he would like to get as "much of a full picture" as he could. There is no evidence this was done.

    82.4.  Mr. Eury stated on page 92 that a staff meeting was held in March 2014 having to do with policies and procedures dealing with refusing bookings due to medical issues.  Mr. Eury stated there have been complaints from the Eureka Police Department due to numerous booking

refusals.    Attached in Mr. Eury's deposition are the various Power Point documents used at this meeting.  Here are two of them:

82.4.1.    The Current Refusal Criteria Power Point document in part stated, "...acute drug intoxication that, taken together, indicates a critical medical situation could be imminent."  Under a sub-section, "Profuse abnormal sweating...extreme agitation...."

82.4.2.    The Misc Items Power Point document deals with refusal of vital signs.  It states the importance of making a valiant effort to obtain the vital signs of the inmate.  The document states if someone is intoxicated a "passive refusal" is not a refusal and to document the efforts taken to take the vitals and document how the inmate refused.

82.5.  Mr. Eury's testimony shows the importance of the officers to follow policy and procedures and make certain a nurse is present in the booking area at the time a prisoner is brought in so the nurse can personally assess the prisoner when the policy calls for such assessment.

82.6.  Mr. Eury's testimony shows the importance for the nurses to follow policy and procedure to learn as much about a newly arrived prisoner as possible and then refuse their booking if appropriate.

83. A medical expert will opine further on Mr. Eury and medical services.

**Inmate In-Custody Death After Action Review:**

84. An Inmate In-Custody Death After Action Review report was written.  This report was written by Sergeant Christian (depo page 13).  The Critical Incident Debriefing date is June 24, 2014.  To recap, the date of this incident is June 13, 2014.

84.1.  I am not opining on either the objectivity nor the completeness of this report. I am only commenting on two areas.

84.2.  Officer Wibbenhorst and Corporal Bittner both stated that the windows in the sobering cell are very hard to see through.  Corporal Bittner stated the scratches on the window make it difficult to see inside.

84.3.  Sergeant Christian stated a lesson learned from this incident is to "...be aware of a sudden change in demeanor such as in this case moving all over the cell to laying dormant without much movement."

84.3.1.    I agree with the sergeant.  One reason that excited delirium cases are considered a medical emergency is because often times when the subject suddenly stops his movements and/or resistance and appears to cooperate and/or settle down, that is when death may occur.

84.4.  Recall what Corporal Bittner had stated in her deposition when she was asked about her observation of the decedent sleeping (from watching the monitor), she explained on page 113 that the decedent "Finally, laid down."  This was only after her observations of the decedent's extreme agitation behavior.

**The danger of complacency:**

85. It is my understanding that the decedent has been incarcerated at the jail before and is a "repeat customer."

85.1.  It is very common for jail staff to see the same inmates returning again and again. These inmates get released and are out on the street for a time, get arrested again, and the incarceration cycle begins anew.

85.2.  When the same inmates are seen returning time and time again, special care must be taken not to become complacent and fail to conduct proper intakes to ensure the care and safety of these returning inmates.

85.3.  When an inmate is released, the jail staff has no knowledge whether the inmate's medical condition and/or drug problem has worsened while the inmate was out of jail.  If the returning inmate comes to jail for being under the influence of drugs, the jail staff has no information whether the same drugs were taken and whether the same amount of drugs were taken as well.

85.4.  While the inmates' past jail medical issues are of course important to take into consideration, each new intake evaluation and assessment must stand on its own merits with the information and observations at the time of the intake.   This is precisely why jails have policies, procedures, and protocols in place to properly assess each inmate to develop the needed information to ensure the inmates' safety.

85.5.  Reasonable officers know the dangers of complacency and know the dangers of not following policy and procedures needed to keep inmates safe and healthy.

**Sergeant Duane Christian:**

86. Sergeant Duane Christian is the jail's designated person most qualified to speak to various jail topics including the sobering cell's audio monitoring system, the sobering cell's sick call procedures, and the training the correctional staff receive.

    86.1.   On December 7, 2015, Sergeant Christian was deposed.  In his deposition he made a number of statements covering these areas which are important to consider.

Sobering cell audio monitoring system:

87. Sergeant Christian explained on pages 24 – 27 about the sobering cell's audio monitoring system.  He explained that a loud noise, yell, or scream from within the sobering cell activates a touch screen in the processing area with an audible beep, and that a screen in the processing area shows from which sobering cell the noise came.

    87.1.   The sergeant stated sometimes the beep is turned on and sometimes it is not turned on.  He stated it depends on who is working there at the time.  There is no policy about keeping the audible beep turned on.

    87.2.   Sergeant Christian stated there is no policy requiring a staff member to monitor the screen for the audible activation, there is no policy requiring officers to take action during an activation, and there is no training for the officers on just how to use the monitoring system.

    87.3.   The fact that there is no policy and training about when to respond to an activation to check on the inmate's welfare is important.

    87.4.   On page 90 of the sergeant's deposition he stated there is no training on the types of medical conditions or distress which would require a medical response or further investigation.

    87.5.   If an inmate in the sobering cell is in medical distress the only way the inmate can summon help, other than waiting for a safety check, would be to yell and bang on the door and window.  When the inmate yells and bangs on the door and window, the processing area staff is notified visually on the screen and by a beep, if the beep has not been shut off by a staff member.

        87.5.1.    As noted in the video matrix of the sobering cell, at 1444 hours the decedent was indeed banging on the cell door and window.  It

looked as though he was trying to get the staff's attention yet no one came to check on him.

87.5.1.1.  This lack of policy and a failure to train to respond to the needs of sobering cell inmates endangers their health and welfare.

## Eureka Police Department policy for their audio monitoring at the department's Temporary Holding Facility:

88. While the Humboldt County Correctional Facility jail does not have a policy about keeping the sobering cell's audio monitoring alarm turned on, it is worth noting that the Eureka Police Department has such a policy in place (even though the holding facility was decommissioned when Chief Mills took over early in 2014, Mills depo page 26 and 42).

88.1.  The Eureka Police Department's policy for their Temporary Holding Facility, Policy 900.1.1, item 47, adopted April 4, 2010, exhibit 6, Chief Mills' deposition, states in part under Supervision of Prisoners, "The audio monitoring system will be left on at all times when there is a prisoner in the holding cell area, and the arresting officer or other designated person will be in the immediate area of the device to monitor the audio activities in the cells."

88.1.1.  When the Eureka Police Department did have an active holding facility, the fact that they had a policy about keeping the audio monitors on at all times illustrates the importance of having such a policy to ensure the safety of their prisoners.

## Absence of audio and video monitoring policy and procedures of the sobering cells at the Humboldt facility jail:

88.2.  In the absence of any policy and procedures for the following:

88.2.1.   keeping the audible beep turned on in the processing area to alert officers of audible inmate activations from inmates in distress in the sobering cells (see section 82.1),

88.2.2.   requiring officers to monitor the sobering cell's monitor screen for audible activations (see section 82.2),

88.2.3.   requiring officers to take action during activations (see section 82.2),

88.2.4.    there should *be obvious common sense* policy and procedures to ensure officers are properly monitoring and responding to the needs of the inmates in the sobering cells.

88.3.  Why have a sobering cell monitoring system if the system is not monitored?

Sobering cell sick call:

89. Sergeant Christian explained on pages 68 about the sobering cell's sick call procedures.  Sick call is when an inmate can request medical help.

89.1.  The sergeant stated if an inmate in the sobering cell needs medical help the inmate would notify the correctional staff and then the correctional staff would summon the medical staff.  The sergeant stated "Yes" when asked if the inmate in the sobering cell would have to ask loudly enough and/or bang on the door or window.

89.2.  As noted above, since there is no policy and no training to respond to an audible alert, no one is required to come to the aid of a distressed inmate who is trying to summon help.  To reiterate, at 1444 hours the decedent was indeed banging on the cell door and window.  It looked as though he was trying to get the staff's attention yet no one came to check on him.

89.2.1.    This lack of policy and a failure to train to respond to the needs of sobering cell inmates endangers their health and welfare.

Training deficiencies:

90. On page 55 of Sergeant Christian's deposition he explained there no requirement that correctional staff must complete the medical issues training before the staff member is assigned to work in the booking area.  This is an important admission because it is in this area that the staff completes the medical receiving screening.

90.1.  The Pre-Booking policy, B-001, exhibit #2 in the sergeant's deposition, in part states that "trained" correctional staff will complete the task.  It is unreasonable and it is against policy to have a non-trained correctional staff member complete the medical receiving screening.  Inmates' health and welfare depend on *trained* staff members completing the intake process properly.

90.2.  Title 15, section 1207, item 43, in part states that the medical receiving screening of inmates shall be performed by licensed health personnel or trained facility staff.  If a correctional officer who is not trained performs the screening, then that screening is in violation of Title 15, section 1207.

91. On page 63 of the sergeant's deposition, he explained there is no specific training that requires the staff to have medical respond if there are "Yes" answers on the medical intake booking questionnaire.  The sergeant also stated on page 64 that there in no training to call medical if the inmate is profusely sweating.  The sergeant stated it is "subjective" as to when to summon medical.

91.1.  According to the Medical Receiving Screening policy, number H-002, see section 50 above, the medical staff must medically clear an inmate with medical conditions.  Without proper training and without clear policy, the staff would fail to call for medical when medical clearance is mandated and when the inmates' health and welfare is at stake.

91.2.  The sergeant stated if an inmate was sweating profusely, the staff would talk with the arresting officer.  There is no evidence this took place.

92. On page 65 of the sergeant's deposition, he explained there is no training to summon medical if the inmate at intake is not oriented to self, date, time, and place.

92.1.  According to the jail's Identification and Handling of Mentally Disordered Inmates policy, number H-102, item 18, the medical staff shall medically clear such an inmate.  See section 51 above.

92.1.1.    Without proper training, the staff would fail to summon medical when required.

93. On page 77 of the sergeant's deposition he explained there is no requirement and/or training to summon medical if the inmate is displaying bizarre behavior and/or cannot or will not answer questions.  The sergeant stated there is no training in how to determine if an inmate is mentally disordered.

93.1.  According to the jail's Identification and Handling of Mentally Disordered Inmates policy, number H-102, item 18, states in part on page 3, under General Information, section 4: "Arrestees who appear to be mentally disordered at intake shall require medical clearance prior to acceptance for booking.  Facility health services staff shall be called to

the pre-booking area to assess the medical and mental condition of the arrestee."

    93.1.1.   Without proper training and requirement, the staff would fail to summon medical when required. See section 51 above.

94. On page 92 of the sergeant's deposition he explained there is no specific training about seeing if the inmate will respond if it appears he may be sleeping for a while. The sergeant stated that it is "kind of standard practice" that if the staff does not see the feet move and/or if the staff does not see movement, the staff might tap on the window or go in and check on the inmate.

   94.1.  The evidence shows that even though the decedent had not moved during the third, fourth, or fifth safety check, no staff member checked to see if the decedent was alright.

     94.1.1.   This lack of policy and a failure to train endangers inmates' lives.

## Deposition of Jodel Jencks, the person most qualified from the CFMG:

95. Ms. Jodel Jencks is the CFMG person most qualified and currently the director of operations, page 9 of his deposition.

   95.1.  On page 40 of Ms. Jencks' deposition, he stated that CFMG does not have a mental health contract with the jail and that CFMG does not teach the correctional staff about mental health.

   95.2.  According to the power point presentation, Mental Health Jail Services provides mental health treatment to the inmates.

   95.3.  On page 42, Ms. Jencks stated the program manager, Mr. Eury, provides the medical issues training to the correctional staff by using a power point presentation he, Mr. Eury, put together (see power point presentation portion below). Ms. Jencks stated he does review the power point presentation by Mr. Eury, page 43. On page 85, Ms. Jencks again stated the program director (Mr. Eury) teaches the medical issues class.

   95.4.  On page 53 of Ms. Jencks' deposition, he stated that CFMG nurses are the most appropriate persons to decide if an inmate needs to be evaluated/treated off site by outside medical staff (such as the local emergency room). Ms. Jencks' added that the inmate would not be transported off site without the authority of the officers.

95.5.  On page 111, Ms. Jencks stated that medical staff responds to all intakes whenever the officers have concerns.  He added, "If they call, we respond, regardless of why."

95.5.1.    This is why it is so terribly important for the correctional staff to follow policy and procedures to summon the medical staff to respond to evaluate a newly arrived inmate when the policy calls for such a response, especially when the inmate is going into a sobering cell (as noted in sections 54 – 57, pre-booking procedures and sobering cell procedures, listed above).

95.6.  On page 130, Ms. Jencks stated it is his understanding that the medical staff followed policies and procedures in this case.

95.7.  On page 131, Ms. Jencks stated no one from CFMG ever interviewed or requested a written statement from Nurse Hampton concerning this case.

95.8.  On page 131, Ms. Jencks was asked it anybody from CFMG watched the video of the descendent in this case.  Ms. Jencks stated, "I did not.  Not to the best of my knowledge."

95.8.1.    Mr. Borges died after he was observed by Nurse Hampton.  One would expect that the CFMG supervisors, program director Mr. Eury, and the director of operations Ms. Jencks, would have certainly spoken with Nurse Hampton and would have certainly viewed the video, especially since the nurse's actions were captured on the video, before stating that CFMG had followed policies and procedures in this case.

95.9.  A medical expert will opine further on Mr. Eury and medical services

## Mental and medical issues training power point presentation taught to the correctional officers:

96. On January 8, 2016, I received a copy of the mental and medical issues training power point presentation which is used to train the correctional officers, item 44.  This power point is divided into two areas.  The first half is about the jail's mental health services and the second half is about the medical services.

97. I identified five primary areas in this power point presentation important to my evaluation of this case.

97.1.  On page/slide 8, the mental health clinician duties are listed.  One of their duties is to provide their services at the "initial intake assessment" of newly arrived prisoners.

97.2.  This is important because as noted in my report, due to the jail's Identification and Handling of Mentally Disordered Inmates policy, number H-102, item 18, states in part on page 3, under General Information, section 4: "Arrestees who appear to be mentally disordered at intake <u>shall</u> require medical clearance <u>prior</u> to acceptance for booking. Facility health services staff <u>shall</u> be called to the pre-booking area to assess the medical and mental condition of the arrestee."

97.3.  The evidence shows that not only did the decedent display signs and symptoms of mental illness at intake; the decedent was known to the correctional staff to be mentally ill.

97.3.1.    In order for a newly arrived inmate to be evaluated by either the mental health staff and/or the by medical staff at intake, the correctional staff must call them to respond.  As shown, this was not done.

98. On page/slide 11, the available working hours of the mental health staff was listed as Monday through Friday, 0800 hours to 1630 hours.  Since the decedent arrived at the jail at 1434 hours on a Friday, the mental health staff would have been on duty.

99. On page/slide 30, "Medical issues, emergencies, general" states, "Some cases are obvious.  For the less obvious, if the inmate appears to be in distress (not just uncomfortable) or a sudden altered state of consciousness, then assume an emergency."

100.    On page/slide 30, "Medical issues, emergencies, general" states, "Signs of distress: Not breathing, trouble breathing…severe anxiety…**profuse sweating**"

100.1. As shown, the decedent was seen in distress and sweating profusely and in various levels of consciousness upon entry into the jail and during the safety checks yet no action was taken until he was found at 1600 hours.  Additionally, before the 1600 hour check when he was finally attended to, the decedent was seen trying to signal for an officer yet no one responded.

101.   On page/slide 63, "Medical issues, urgent issues" is written for the inmates' own information and use.  It is my understanding that inmates are to be informed of this medical help procedure at intake; however, there is no evidence the decedent was so informed.

101.1. This training slide states, "Medical staff is available 24/7.  If you have a medical emergency, *let the officer know* and they will contact medical staff...."

101.1.1.   To recap, at 1444 hours the decedent was indeed banging on the cell door and window to get the staff's attention, yet no one came to check on him.

**Concluding thought about what happened at the jail:**

102.   The medical condition of the decedent upon entering the jail and upon placement into his sobering cell was not an unusual circumstance for jailers to manage.  Jail administrators, mangers, and governmental agencies such as the Board of State and Community Corrections, BSCC, know that in order to reduce loss of life and ensure the safety and welfare of inmates, policies and procedures are carefully written and set in place.

103.   Having well written polices and procedures are not enough.  There must be close supervision and on-going, verifiable training that teaches how to follow and comply with these polices and procedures.  The training must teach how to follow the actual written polices and procedures in place.  There must not be a "disconnect" between the written policies and procedures, the training, and what happens in actual practice in the day to day operation of the jail.  If the correctional staff is not properly trained, these policies and procedures are useless.

104.   No matter how well written policies and procedures may be, they are useless if they are not followed.  When policies and procedures designed to reduce loss of life are not followed, inmates die.

**Materials and items considered in forming opinions and exhibits to be used in support of Findings and Opinions:**

1. Copy of lawsuit
2. DVD of the video of the dash camera, the rear seat of the police car, and from inside of the jail
3. Officer Stelzig's arrest report
4. Officer Stelzig's supplemental arrest report
5. Officer Franco's supplemental report

54

5A. Weather information for June 13, 2014
6. Officer's booking slip
7. Booking observation report, (Yes – No questions)
8. Jail Incident reports
9. Humboldt County Sheriff, Inclusive Case Report
10. District Attorney investigative report
11. District Attorney supplemental report
12. Cell safety check observation log
12A. Sobering / Safety Cell / Restraint Log
12B. On-Site Emergency Response Record
13. Coroner's death investigation report
14. Autopsy report – cause of death
15. Title 24 building code
16. Medical care contract with CFMG
17. Training records
18. Policies and procedures set 1
19. Polices and procedures set 2
20. Photos of the decedent
21. Morbidity and Mortality report
22. Jail roster
23. ER records from hospital
24. Officer Stelzig's deposition
25. Cpl. Hammer's deposition
26. Cpl. Bittner's deposition
27. Officer Goodale's deposition
28. Officer Franco's deposition
29. Mr. Eury's deposition
30. Officer Swim's deposition
31. Nurse Hampton's deposition
32. Seat Belt Policy
33. Taser policy
34. Excited-Agitated Delirium and Sudden In-Custody Death information
35. Inmate In-Custody Death After Action Review at the jail
36. Supervising Correctional Deputy Hershberger depo
37. Officer Rogers' deposition
38. Adult Corrections Officer Core Course (on line, July 2011),
    http://www.bscc.ca.gov/downloads/ACO_Core_Manual_2010_2011_with_
    cover_inc.policy_updates_7.13%28rev_07-2013%29.pdf
39. Adult Corrections Officer Knowledge and Skills Map for Standards and
    Training for Corrections Program,
    http://www.bscc.ca.gov/downloads/ACO_Knowledge_and_Skills_Maps.pdf
40. Dr. Gustin's report
41. Safety check policy, #F-018, page 4 for sobering cell checks
42. Sergeant Duane Christian's deposition and exhibits

43. Title 15, section 1207, medical receiving screening
44. Mental health and medical issues training power point presentation for the correctional staff
45. Jodel Jenks deposition
46. Eureka Chief of Police Mills' deposition
47. Exhibits from Chief Mills' deposition
48. Nurse Jacqueline Moore expert report

**The following are my qualifications for reviewing, consulting, and issuing opinions:**

See attached CV.

**<u>Prior cases in which I testified as an expert in a deposition and/or at trial in the last (4) four years:</u>**

Richard Lichten's current list of cases in which expert testimony was given as of September 21, 2015:

**<u>Depositions:</u>**
2011 (Plaintiff) Casillas v. City of El Paso, Texas. Deposition testimony. Case number: EP-10CV-0415 FM, United States District Court, Western District of Texas, El Paso Division.

2011 (Plaintiff) Hernandez v. City of West Covina. Deposition testimony. Case number: 2:10-CV-03703-GHK-FFM, United States District Court, Central District of California.

2011 (Plaintiff) Elliott v. Cruz. Case number: 09CECG02976.

2011 (Plaintiff) Dill v. City of Los Angeles. Case number: BC432645.

2012 (Plaintiff) Mares v. Los Angeles County. Case number: CV10-10077-RSWL-(FFMx).

2012 (Plaintiff) Lewis v. Tazewell County. Case number: 1:10-cv-01268-MMM-BGC #1. Federal Case.

2012 (Plaintiff) Payne v. City of Chicago. Case number: 10L7442. Deposition testimony.

5/2012 (Plaintiff) Stewart v. County of Del Norte. Case number CVUJ-10-1258.

4/2012 (Defense - Civil) Colarossi v. Caltrans, et al. Case number SC109408.

2012 (Plaintiff)  Ruth Hall v. Imperial County.  Case number 12CV0432 DMS RBB.

2012 (Plaintiff) Tapia v. Skarupinski (City of Chicago) et al.  Case number 11C7997.  Federal Case.

2012 (Defense – Civil) Harb v. City of Bakersfield and Hall Ambulance. Case number: KCSC, S-1500-CV-265887-SPC.

2012 (Plaintiff) Leocadio Figueroa v. Los Angeles County.  Case number CV-11-06228 DMG (FFMx).

08/2013 (Plaintiff)  Cox v. State of California (CHP).  Case number BC473308.

07/2013  (Plaintiff)  Xu v. City of Monterey Park.  Case number CV12-7043 PSG (JEMx), United States District Court, Central District of California.

03/2014 (Plaintiff)  Bosch v. Riverside Sheriff.  Case # EDCV-13-2352 SVW (FFMx).

08/2014 (Plaintiff) Rivera v. City of Azusa.  Case number: 2:13-cv-01510-DMG (VBKx)

08/2014 (Plaintiff) Brummett v. County of San Diego.  Case number: 12CV1428 LAB BGS.

08/2014 (Plaintiff) Lundell v. County of Sacramento.  Case: 2:12-CV-02832-MCE-AC.

09/2014  (Defense – civil) Frary v. County of Marin.  Case number C 12-3928 MEJ.

10/2014 (Plaintiff)  Armstrong v. Del Amo mall.  Case number BC517064.

02/2015 (Plaintiff) Morgan v. CDCR (State prison).  Case #CIV 1202861, San Quentin Prison.

04/2015  (Plaintiff)  Tony McGee v. LACO.  Case: CV13-5816 BRO (MANx).

11/2014  (Plaintiff)  Laurie Allen v. CHP.  Case #2:13-CV-01821-GEB-EFB.

06/2015 (Plaintiff)  Leon v. City of Santa Ana.  Case #8:14-cv-00387-JLS-DFM.

06/2015 (Plaintiff) Pierre Moradian v. City of Glendale.  Case #CV14-01178.

06/2015 (Plaintiff) Crawley v. King's County.  Case #1:13-CV-02042 LJO-SAB.

07/2015 (Plaintiff)  Rosales v. City of Chico.  Case #2:14-CV-02152-WBS (CMK).

08/2015 (Plaintiff) Forester v. LACO.  Case # CV14-07231-ODW (Jemx)

## Civil trial:

2011 (Plaintiff) Oriyomi v. Los Angeles County.  Case number: BC441588.

2011 (Plaintiff) Dill v. City of Los Angeles. Case number: BC432645. Emergency driving.

2012 (Plaintiff) Leocadio Figueroa v. Los Angeles County.  Case number CV-11-06228 DMG (FFMx).

05/2014  (Plaintiff)  Cox v. State of California (CHP).  Case number BC473308. Deposition testimony.

11/2014 (Plaintiff)  Brummett v. County of San Diego jail.  Case number 12CV1428 LAB BGS.

11/2014  (Plaintiff)  Crime, Justice & America, Inc., v. Jerry Smith, Sheriff of Butte County.  Case number 2:08-cv-00343 TLN EFB.

06/2015 (Plaintiff) Pierre Moradian v. City of Glendale.  Case #CV14-01178.

09/2015 (Plaintiff)  Leon v. City of Santa Ana. Case #8:14-cv-00387-JLS-DFM.

09/2015   (Plaintiff)  Espinoza v. Riverside County.  Case #EDCV 14-00085-JGB (SPx)

## Civil Service Commission Hearing:

03/2015 (Defense – civil service hearing) Deputy Eric Kabota v. County of Marin. There is no case number.

## Criminal trials:

2012 (Defense – Criminal) People v. Morales.  Case number: BA388483.

2012 (Defense – Criminal)  Nevada v. Pringle.  Case number: CR6487A.

2011 (Defense - criminal) People v. Tillman.  Case number: BA379936. Trial testimony.

2011 (Defense - criminal) People v. Jermaine Johnson.  Trial testimony.   Case number: BA379965.

01/2014 (Defense – Criminal)  People v. Leon.  case: 12CF1106.  Trail testimony.

08/2013  (Defense – Criminal) People v. German.  Trial testimony.  Case number 1EA10820.

10/2014  (Defense – Criminal)  People v. Arrellano.  Case #VA131304.

04/2014 (Defense – Criminal) People v. Goncher. This is an Arizona case.  Case #CR2013-428028-001 DT.

10/2014 (Defense – Criminal) People v. Picardo.  Case number 4FF00698

04/2015 (Defense – Criminal) People v. Kinney.  Case #4CP04594.

07/2015 (Defense – Criminal) People v. Carpenter.  Case BLF1300185.

09/2015  (Defense – Criminal) People v. Bloodworth. Case #BA433512.

**Evidence hearing:**

7/2013 (Defense – Criminal) State of Nevada v. Villagrana.  Case number CR11-1718.  Civilian on Civilian.

**Compensation:**

$4,000.00 initial retainer
$300.00/hour case work
$400.00/hour testimony (four hour minimum)
$100.00/hour travel
$.60/miles driven
Reasonable lodging, airfare, etc.

**Signature:**

Richard Lichten, CLS
Police and Jail Procedures, Inc.
P.O. Box 801884
Santa Clarita, CA 91380

661-406-7258
fax 661-296-6171
rick@policeandjailprocedures.com
www.policeandjailprocedures.com

X _____     Date: 1 – 10 – 16