# Exhibit "A"



**5861 S. Albion Court, Greenwood Village, CO 80121**
**(303) 771-1637      moor143@outlook.com**

January 11, 2015

Mr. Dale K. Galipo
Law Offices of Dale K. Galipo
21800 Burbank Blvd, Suite 310
Woodland Hills, CA 91367

Mr. John C. Fattahi
Attorney at Law
1301 West Glenoaks Blvd
Glendale, CA 91201


Dear Mr. Galipo and Mr. Fattahi:

Regarding Stephany Borges v. City of Eureka, et al., Case No. 15-cv-00846-YGR in the United States District Court for the Northern District of California:

My name is Jacqueline Moore RN, PH.D, CCHP-A.  I am an independent nurse consultant working in correctional health care.  I have served as the American Nurses Association representative to the Board of the National Commission on Correctional Health Care (NCCHC). I also served as their Executive Director (1995-1996) where I was responsible for the accreditation program.  I was on the committee assigned to revise the 1996 NCCHC Jail Health Standards and have written questionnaires for the NCCHC that are used in the accreditation process. I have worked in correctional health care on a national level for over 35 years. My prior position was the Health Services Administrator for the Cook County Juvenile Detention Center in Chicago, IL.

I have been on the Board of Directors of the American Correctional Health Service Association, a professional organization in correctional health care. I have served on the Board of Trustees for NCCHC and am involved in the nursing certification program.  I was on the American Nurses Association task force that revised the Scope and Standards of Nursing Practice in Correctional Facilities.  In 2008, I received the Distinguished Service Award for my industry.  I have an advanced certification in correctional health care from NCCHC. I am familiar with health care provided in correctional institutions.  I am licensed to practice nursing in the States of Colorado and Illinois.  I am familiar with Title 15 of the California Code of Regulations.

My education and work experience are outlined on my curriculum vitae. Publications that I have authored are also included as part of my vitae.  Cases that I have testified in are attached hereto at Exhibit B.

**Documents Reviewed**

First Amended Complaint
Humboldt County Inmate Medical Services Contract
Pictures Mr. Daren Ethan Borges
Sobering Cell CFMG form 6/13/14
Incident Report David Swim 6/13/14, 16:22
Incident Report Terri Bittner 6/13/14, 16:30
HCSO Observation log Daren Borges 6/13/14 @1400 to 16:16
Pre-Detention Medical Evaluation/Receiving Screening (HCCF)
Alcohol Intoxication and Withdrawal (Sobering Cells)
Pre-booking Procedures
Medical Receiving Screening
Intoxication and Handling of Mentally Disordered Inmates
Sobering Cell
Safety Checks
Personnel Responsibilities Program Manager, LVN, RN
Daren Borges Jail Medical Records
Coroner's report 6/13/14
Investigative Report M Perrone
Investigative Report Bernstein
Staff Meetings March 2014, April 2014, January 2015
Quality Assurance Meeting January 26, 2015
Quality Assurance Peer Review November 14, 2015, August 15, 2014
Morbidity and Mortality Review June 13, 2014
QI Tracking Deb Mattson 1/16/15
AWS November 2013 AWS Flow Sheet vs. Sobering Cell in-service
Deposition Cpl. Terri Bittner
Deposition Officer Michael Stelzig Jr.
Deposition Officer Franco
Deposition Officer Goodale
Deposition Ann Marie Hampton LVN
Deposition Cpl. Timothy Hammer
Deposition David Swim
Deposition Robert Eury
Video of Borges' arrest, booking and in sobering cell
Report Barry E. Gustin,  December 16, 2015
Deposition Stephany Borges
Humboldt County Training Material for Officers

2

'Competency and the Capacity to Make Treatment Decisions: A Primer for Primary Care
   Physicians.  The Primary Care Company to the Journal of Clinical Psychiatry'  Leo,
R. MD.  Retrieved from http:// www.nchi.nih.gpv/pmc articles/PMC181097

'Delirium'  Mayo Clinic.  Retrieved from www.mayoclinic.org/diseases-
conditions/delirium/basics/causes/com

'Drug Facts: Methamphetamine' National Institute on Drug Abuse Revised January
2014

'Correctional Health Care: The legal perspective'.  Hudgins, N. (2003). In J. Moore (Ed.)
in Management and Administration of Correctional Health Care' (pp. 3-3). Kingston, NJ:
Civic Research Institute.

Licensed Vocational Nurse Scope of Practice Standards; Chapter 5. January 2002.


**Facts of the Case**

Daren Borges was arrested on 6/13/14 for a misdemeanor (drunk in public).  Mr. Borges
was observed picking weeds from the ground, snorting dirt, licking the ground and
hitting his head. The arresting officers saw that Mr. Borges was experiencing a medical
and/or psychiatric emergency.  However, despite their observations, they did not seek
medical care for Mr. Borges.  Mr. Borges did cooperate and enter the police vehicle
(investigative report).

He was brought to HCCF where he was booked in by Officer Swim and Cpl. Bittner.
Officer Swim, in his incident report, described Mr. Borges as very erratic, constantly
moving around and had difficulty following directions.

An additional correctional officer was called for in the booking area because Cpl. Bittner
felt that Mr. Borges' behavior was unpredictable, but medical staff was not summoned
to assist.  Mr. Borges was patted down and taken to the sobering cell.  Officer Swim
indicated in his incident report that Mr. Borges walked to the sobering cell without being
helped.  However, Cpl. Bittner described the incident as Cpl. Hammer controlled his
right side while she controlled his left side

While in the sobering cell, Officer Swim noted that Borges was taking his clothes off.
Cpl. Bitter described Mr. Borges' behavior as erratic in the holding cell, removing his

3

clothes, rolling around on the floor, soaking his clothes in the toilet and trying to flood the cell (incident report Cpl. Bittner).

Nurse Hampton was advised that Mr. Borges was in the sobering cell around 22:40. Because the nursing shift was changing, she reported the call to the on-coming nurse but went to evaluate him herself. She took the sobering cell form with her.

An on-site emergency response completed by CFMG on 6/13/14 at 16:00 indicates that the patient was found unresponsive, pulseless, without respirations, with blue lips and finger tips.  CPR was initiated.  Airway insertion attempts were unsuccessful because staff was unable to open Mr. Borges's clenched jaw.  The fire department arrived at 16:08.  The ER report indicated that they were unable to revive him and the code was called off at 16:34.  The coroner's report listed the cause of death was acute methamphetamine intoxication.  He indicated that there were high levels of methamphetamine found in his blood.  The coroner also indicated that Mr. Borges was exhibiting some signs of excited delirium such as attempting to cool himself off with toilet water.  Other significant conditions included schizophrenia, chronic illicit drug abuse, and chronic hepatitis C.

A morbidity and mortality review conducted on June 13, 2014 showed that Mr. Borges had a long history of substance abuse and mental health issues with poor treatment adherence.  The recommendation by Dr. Greenberg, the physician conducting the review, stated that when people present to HCCF they need to be rapidly evaluated for toxicity from substance abuse.  The evaluation must include vital signs and evaluation for delirium.  In a further review of this case a CQI tracking log from Deb Mattson (January 16, 2015) indicated that Dr. Fithian pointed out in this case that the arrestee refused to have his vital signs taken, and that to refer every arrestee that refuses vital signs to the ED would place a burden on the County.

Prior medical records dated 1/9/14 indicate that Mr. Borges was booked in the HCCF and was taking Zyprexa; Nurse Hampton refused Mr. Borges admission to HCCF due to a high pulse rate.  Upon his return, he was ordered Neurontin and Zyprexa.

The cornerstone of the delivery of timely and necessary health care services in correctional facilities is the reception screening that is provided during the first hours of detention.  One of the core goals of the receiving screening is that individuals must be identified and proper care initiated without delay.

Although it is the subject of on-going debate among correctional health experts, both the National Commission on Correctional Health Care (NCCHC) and the American

4

Correctional Association (ACA) allow small facilities to use health trained correctional officers to perform the initial receiving screening.  The health trained officers should be experienced in conducting a medical history, making required observations, documenting their findings and determining appropriate dispositions and referrals.

Since the duties of correctional officers involved in the intake screening determine which arrestees will and will not be booked into the jail, the training should be comprehensive and include training regarding recognition of signs and symptoms of substance abuse, intoxication and overdose, symptoms of excited delirium, when to refuse inmates to the jail (e.g. severe bleeding, recent head injury, arrestees displaying acute alcohol and drug withdrawal etc.). Ongoing training during subsequent years of employment enables the officers to sharpen their skills and keep abreast of changes in medical or mental health conditions.  Through the medical screening, trained correctional staffs document their initial observations of arrestees and record their responses to questions pertaining to medical and mental health problems.

If there is a question of acceptance, facility health staff should be called to assess or refer the arrestee for medical clearance. Whenever officers have a question, the threshold for a medical referral should be extremely low.  Any inmate that is demonstrating bizarre and inappropriate behavior should be assessed by medical staff and a referral made to the emergency room or mental health staff.   The four main vital signs routinely monitored by medical professionals and health care providers include: body temperature, pulse rate, blood pressure and respirations.  Mr. Borges was a known methamphetamine abuser at the jail.  If an LPN had been called to the pre-booking area, she would have likely identified a high pulse, temperature and blood pressure which would have prompted her not to accept this inmate.

Instead, Mr. Borges was placed in a sobering cell.  The policy for HCCF is to obtain an assessment from the health care staff as soon as possible prior to placement in a sobering cell.  In the sobering cell the arrestee should be assessed for their ability to walk around, ability to be aroused, ability to follow commands and any problems with the quality of their respirations.

5

According to the California Licensed Vocational Nurse Scope and Practice Chapter 5, LVNs are not independent practitioners.  The LVN must practice under the direction of a licensed physician or RN at all times.  The LVN may assist in the collection of assessment data, however, validation of the assessment data should be done by the RN.  Nurse Hampton should have reported her observations regarding Mr. Borges to the RN on duty and/or notified the physician on-call for further direction.

**My opinions are as follows**

**1.**

The failure of county officers at Humboldt County Correctional Facility (HCCF) to follow policies and procedures regarding conducting a thorough intake receiving screening in the intake area resulted in Mr. Borges being improperly accepted for booking without medical clearance.

The CFMG/County policy for pre-detention evaluation of health screening requires that "trained custody staff" complete a standardized receiving health screening on all inmates at the time of intake.  This intake screening consists of making observations and asking questions regarding issues including medications, substance use, history or appearance of suspected mental illness, and behavior.  Positive screening findings are required to be referred to the nurse on duty for further evaluation.  The policy provides that the purpose of this "immediate medical staff evaluation" is to determine whether outside medical evaluation or treatment is required when there is any positive history of acute illness or trauma in the past 24 hours.  The policy further states that that certain inmates or arrestees shall not be accepted into the jail prior to outside medical evaluation and clearance, including those who cannot walk under their own power, are having or have recently had convulsions, have signs of head injuries, have any type of serious illness, or who are displaying acute alcohol and drug withdrawal.

The CFMG/County policy on Mental Health Services requires that all new inmates shall be observed and queried for signs/presence and history of mental illness including use of medication for psychiatric treatment as part of the intake health screening completed by trained custody staff.  Any inmate exhibiting or testifying to the presence or history of mental illness is referred to health services staff for further evaluation.  The County Jail's policy on Mentally Disordered Inmates further provides that, prior to accepting an arrestee for booking; a trained correctional officer shall alert the facility health services staff of any mental health problems.

6

In the case of Mr. Borges, at the time of the intake screening, he was sweating profusely, disoriented, unable to stand still, had a blank stare, had tremors, and was talking to himself.  Mr. Eury testified that his expectation would be that the booking officers would notify medical staff if an arrestee is not oriented to time, place and person (pg.56), and that the above policy is an appropriate and reasonable policy. Nurse Jenks, the regional manager of CFMG, testified that if there is an affirmative response to any of the questions on the receiving screening, then officers were to notify health care staff (especially if the inmate was not alert pgs. 46-47).  Officers believed Mr. Borges was highly under the influence of a stimulant and had described him as "meth'ed out."  He also was showing signs of a mental illness.  However, health care staff was not notified of Mr. Borges' conditions until after he was placed in the sobering cell.  The County's policy further states that if a mentally disordered arrestee is accepted for booking, the shift supervisor shall consult with the facility health care staff  to determine the appropriate placement of the individual until he can be seen by a mental health counselor.  Mr. Borges was not assessed by Nurse Hampton; therefore mental health staff was not notified.

If medical and/or mental health staff had been notified of Mr. Borges' condition, then Mr. Borges should have been assessed in the intake area.  Such an assessment should have included taking his vital signs, including pulse, blood pressure, respiration rate, and body temperature.  Reasonable correctional nurses, with the assistance of correctional officers, if necessary, are specifically trained to take, and very capable of taking, vital signs even when an arrestee is in a passively resistive or uncooperative state such as Mr. Borges displayed in the intake area.

Common law dictates that individuals possess autonomy and self-determination which encompasses the right to accept or refuse medical treatment.  Medical refusals can be complicated when the ability of the patient to make reasonable decisions is called into question.  Competency is a legal term referring to individual's mental and cognitive capability required to make an informed decision.  In viewing the video of Mr. Borges in the HCCF, it is clear that his behavior was erratic.  He is tearing off his clothes, climbing on a wall, flailing on the floor.  It is clear that he was not competent to refuse vital signs which were never offered to him.

Based on the video recording, his medical and mental health condition and that described by various officers, he then should have been refused for booking and sent

7

==to the Emergency Department for medical treatment and/or clearance.== According to the arresting officers,  Mr. Borges was sweating profusely, agitated, having apparent hallucinations, was in a semi-conscious state, had tremors, was observed hitting his head and likely had an elevated pulse, BP, respiration rate and temperature. Mr. Borges' behavior was floridly psychotic. He was observed talking to himself and hallucinating.  Under these circumstances, Mr. Borges' should have been brought to an emergency room for observation and/ or treatment.

During the booking process, Mr. Borges was distracted, unable to follow directions, did not answer all of the questions.  The receiving screening was incorrectly completed.  Mr. Borges was not oriented to date, time or self.  There was no notation of the visible signs of trauma that the arresting officers identified such as scratches on his face and arms.

**2.**

==There was a failure of both the County and CFMG for not providing the proper training for officers in conduction of the receiving screening, identification of a drug overdose, and ability to assess inmates with mental illness.== There are potential medical-legal liabilities that ensue when non-medical personnel are, by policy, directed to make potentially life threatening health dispositions which can result in loss of life or other bad outcomes.

The CFMG contract with the County requires that CFMG provide 10 hours of annual training to the correctional staff, including on how to appropriately complete the intake questionnaire.  The policy on Medical Receiving Screening requires that officers are initially trained by health care staff to recognize possible medical and mental health problems, at the pre-booking stages.

The County's practice, however, was to only require correctional officers at HCCF to complete one 4 hour training course each year, or one 8 hour course every two years, regarding a combination of medical and mental health issues.  The medical aspects of that training were provided by CFMG.  Cpl. Bittner's training log shows she had last completed the four-hour "Medical Issues" training more than three years before the incident, and Officer Swim had never completed it before the incident.  The deposition testimony of the officers of HCCF revealed inconsistent information regarding training on conducting a pre-booking screen and specifically when to contact medical staff for assistance.  Officer Bittner testified that she received some training, while Cpl. Hammer and Officer Swim testified that they did not have any training.  There were also sporadic half-hour refresher training courses regarding medical receiving screening

8

and use of the sobering cells led by correctional supervisors, but Cpl. Bittner had not had this training since February 2012 and Officer Swim had never had it.

The program administrator, Robert Eury, was not aware of any training provided to the correctional officers on how to conduct the receiving screening or if the arrestee refused treatment.  However, in the training provided to the correctional officers, there were slides that indicated that if an inmate appeared to be in distress or loss of a sudden state of consciousness then the officers were to assume it was an emergency.  Other signs of emergency situations were severe anxiety, bizarre behavior, and profuse sweating.  Mr. Borges exhibited all of these symptoms.  In addition to these symptoms during the arrest process he was described as odd, dirty, disheveled, and conversing with someone who was not there.

In the deposition of Jodel Jenks, the regional manager of CFMG, she indicated that she visited Humboldt County on a quarterly basis except when she was required to train the new program manager.  The policies and procedures for refusal of an inmate are provided in a Standards and Training Class to correctional officers but not to nursing staff (deposition pg. 30).  Health care staff is trained during their orientation and at staff meetings.  She was not aware of a specific course for correctional officers that was supposed to lead them to alert medical staff (pg.38).  She indicated that she was unaware of a policy for inmates to refuse treatment if they were incapacitated (pg.74).  She appeared to be unclear if the policy required a verbal response of if vital signs could be refused (pg.77).

**3.**

Nurse Hampton failed to conduct a proper medical assessment of Mr. Borges while he was in the sobering cell.
Nurse Hampton did not have nor did she ascertain any medical or mental health information regarding Mr. Borges. She walked up and looked at the log and then signed it.  She did not attempt to obtain a psychiatric history even though Mr. Borges had been incarcerated before at HCCF (pg.53).   In her deposition, she did not feel that her evaluation should include a psychiatric history.  She did not recall why she marked a zero under current medications as she was not sure she reviewed the pre-booking screen completed by the officers. She did not ask the officers that booked Mr. Borges

9

into the facility about his behavior in booking.   She acknowledged that she did not ask any correctional officers to go with her to the sobering cell because once she went there and observed his behavior; she didn't think she needed the officers to open the door (pg.67, 118). Nurse Hampton formed her own conclusion that Mr. Borges might be under the influence of methamphetamine (pg. 68). She observed Mr. Borges for one minute though the glass window.  She made no attempt to try to get his attention and did not know if he was hallucinating (pg. 74).She then walked away and made no attempt to further assess Mr. Borges.  Nurse Hampton should have realized from her brief assessment that this patient needed a further assessment and medical attention.

Based on Jail video from 14:57:30 - 15:57:50 Nurse Hampton saw that Mr. Borges' shirt was off; he was swinging it around, and had excited movements. He was ripping apart his clothing with his teeth, trying to cool his head and body off with wet clothes, squirming around on the floor naked and assumed a fetal position near the door.

She did not take his vital signs.  She did not observe his skin color, gait, or respiratory rate (Hampton, deposition pg. 42). Nurse Hampton did not request the officers open the door so that she could assess him.  She charted "refused", which was inaccurate. In her deposition, she testified that if someone's behavior is such that they might be a safety issue, then medical could defer vital signs. She felt that Mr. Borges was agitated (pg. 119).  If she felt the inmate was too agitated, she should have requested jail staff to assist her in obtaining vital signs. If Mr. Borges was so confused and disoriented then the practice should have been to send him to the ED.

Nurse Hampton did not document how Mr. Borges refused care.

In her deposition, Nurse Hampton acknowledged that she knew that if a patient had overdosed on methamphetamine, there could be a risk for a cardiac arrest (pgs. 89-92).  Because she did not personally evaluate Mr. Borges she claims she did not realize the seriousness of his situation. If she had reviewed the intake questionnaire she would have realized that he was disoriented and his behavior (described above) was bizarre.

Nurse Hampton did not attempt to determine if Mr. Borges had any signs of delirium (pgs. 101-102, 104).

The standard of nursing care requires Nurse Hampton make an accurate assessment of Mr. Borges. Neither the arresting officers nor the booking officers described Mr. Borges' behavior to her while he was being booked.  Had she evaluated Mr. Borges she might have found an elevated temperature, high pulse, increase in blood pressure, and confusion.  A patient that is disoriented to time, place and person and is suspected to be

10

drug or alcohol intoxicated requires emergency care.  Mr. Eury, the program administrator of HCCF testified that it is required for nurses to review the pre-booking form (Eury deposition pg.54).  The form is required to be reviewed and signed (pg.55). Nurse Hampton reviewed and signed the booking form, thus she should have known Mr. Borges was disoriented.

Mr. Eury also testified that if he saw an arrestee sweating profusely, and was not alert and oriented to time, place and person that he would attempt to obtain more information from the arresting officers and booking officers and take the arrestees vital signs (pg.43, 53). He indicated that a high pulse with an arrestee would greatly influence his decision to refer the arrestee for medical clearance.

Mr. Eury testified that if he had observed an arrestee in the sobering cell, he would have tried to converse with the arrestee, observed his color, the person's breathing, or if they were having difficulty breathing.  He would have requested the officers to unlock the sobering cell and accompany him so he could obtain vital signs.   After Mr. Borges' death, the February 2014 staff minutes show that there were 25 inmates refused prior to booking (seven for high blood pressure, one for a high blood sugar and one for a high pulse in a suspected meth intoxication patient).

**Conclusion:**

Methamphetamine overdose is a progressive disease which usually begins with tremors, which may interfere with an individual's gait, and ability to eat. There are frequently mild elevations in blood pressure, pulse and temperature.  The patient becomes anxious, agitated, and irritable.  GI symptoms occur which may include nausea, vomiting and diarrhea.  Sweating is common and may be profuse.  The syndrome described above does not include confusion.  Major drug intoxication described as delirium is accompanied by confusion (delirium), disorientation, and agitation which are quite severe.

It is my opinion the nursing care provided to Mr. Borges was grossly inadequate and contrary to basic correctional nursing standards in light of his obvious medical needs. The nurse should have refused to accept Mr. Borges so that medical clearance would have been required.  Alternatively, the nurse should have immediately taken and documented his vital signs and performed a medical evaluation, made a physician aware of his condition immediately upon presentation.  Adequate information should

11

==have been provided to a physician and the physician should have been made aware of his serious medical need.==

It is my opinion that Mr. Borges was a known methamphetamine abuser who entered the jail with a serious medical problem.  He had symptoms of methamphetamine overdose which were not identified by the nursing staff or referred to a medical provider.  His condition continued to deteriorate while he was incarcerated at the HCCF.

The standard of nursing care can be summarized by three primary components:

• An obligation to have accomplished the level of education and maintain a level of skill required within the position;
• A responsibility to utilize the above mentioned education and skill to provide care in the medical setting, and
• "The duty to use reasonable diligence and best judgment in carrying out duties" (Hudgins 3.5)

==Nurses are charged with utilizing the degree of skill and judgment commensurate with their experience and education.  In this case, Nurse Hampton was guilty of a breach of duty whereby she violated her policies and training and failed to conform to the standard of nursing care.==  As a result of her failure to act, and not report the patient's signs and symptoms to an RN or MD, she was the proximate cause of Mr. Borges' decline and ultimately his demise.

==In summary, the care provided by the nurse fell far below the standard of nursing care.==
I hold these opinions to a reasonable degree of nursing certainty.  Thank you for the opportunity to review this case.  My fees for reviewing these documents are $175 per hour.  I reserve the right to modify my opinion as additional information regarding this case becomes available.


Sincerely,

*Jacqueline M Moore*

Jacqueline M. Moore RN PH.D. CCHP-A, CCHP-RN

# JACQUELINE M. MOORE RN Ph.D. CCHP-A, CCHP-RN
**5861 S. Albion Court**
**Greenwood Village, CO 80121**
**(303) 771-1637**
**moor143@outlook.com**

Experience:        Thirty-five years in the nursing field with emphasis on development and supervision of health care programs in ambulatory and correctional institutions.

Education:        Ph.D. University of Maryland, Baltimore, Maryland
Nursing
Graduated 1990.
Major:  Nursing with minor in Health Policy and Economics

M.S.N University of Pennsylvania, Philadelphia, Pennsylvania
Graduated 1977.
Honors:  Deans List

B.S.N. University of Delaware, Newark, Delaware
Graduated 1975.

R.N. Nursing School of Wilmington, Wilmington, Delaware
Graduated 1967.

Professional and Clinical Experience

**1990-Present**        **Jacqueline Moore & Associates, Littleton, Colorado**
*President*

·        Developed consulting business for correctional health care.

·        Performed site visits and evaluations for clients. Court Monitor for the State of Kentucky Juvenile System. Review of Georgia Department of Juvenile Justice facilities and development of policies, procedures and training

material. Oversaw patient care and compliance for correctional facilities.

Monitor for mental health services for the State of California CDCR regarding Coleman vs. Arnold Schwarzenegger

Performed an evaluation in Puerto Rico regarding correctional health services in conjunction with the Morales vs. Rossello Consent Decree

· Assisted clients with the preparation of proposals, policy manuals, and architectural design for new construction of correctional medical units, and requests for proposal.

· Assisted state systems such as New Jersey, Montana, Idaho, Arkansas, Georgia, Maine, New Mexico, North Carolina and Washington with evaluations of medical services and strategic plans.

· Developed the methodology to evaluate managed health care in the State of Texas for inmates in the Texas Department of Criminal Justice System and the Texas Youth Commission.  Methodology was developed to measure the cost and quality of health care after the implementation of a managed care network.

· Evaluations of health care in State systems in Maine, Delaware, Tennessee, Oklahoma, Minnesota Wisconsin, and Illinois juvenile facilities.

· Worked with OJJDP and the Council of Juvenile Correctional Administrators to develop performance based health standards for juvenile correctional and detention facilities.

· Prior Feature editor for Corrections Management Quarterly.

· Prior Editor Correctional Health Report

**2005 – 2007**     **Correctional Health Care Management**
*Chief Operating Officer*
Provide oversight and fiscal management for 27 contracts located in seven states.  Responsibilities include: budget, staffing, accreditation, utilization management, policies and procedures,

protocols, review of litigation and assistance with marketing proposals.

**2001-2005**          **Cook County Juvenile Temporary Detention Center**
                      *Health Administrator and Clinical Services*

- Developed policies, procedures and protocols for the Juvenile Detention Center.

- Negotiation of settlement agreement regarding health care.

- Preparation of the facility for NCCHC and ACA accreditation reviews

- Hiring and orientation of Staff

- Preparation in grant writing and establishment of collaborative relationship with the County.


**1995 - 1996**       **National Commission on Correctional Health Care**
                      **Chicago, Illinois**
                      *Director of Operations*

- Responsible for the coordination of all committee activities and revision of NCCHC Jail, Prison and Juvenile Health Care Standards.

- Responsible for Accreditation Program which included scheduling of site surveys, preparation of reports, correspondence with facilities, provision of technical assistance, the revision of Standards for Health Services in Prisons, Jails and Juvenile Facilities, and maintenance of annual reports.

- Developed a surveyor course for new surveyors and revised surveyor training manual.

- Provision of technical assistance and development of strategic plans for medical assistance to state systems in Wyoming, Arizona, and New Jersey.

- Responsible for OJJDP grant to develop a recognition program for medical services provided in small juvenile facilities.

3

·     Provides oversight for Quality Assurance Program and developed training seminars on Quality Improvement.

**1991-1994**     **Coastal Correctional Healthcare, Inc., Durham, North Carolina**
*Vice President, New Business Development*
*Coastal Correctional Health Care, Inc.*

·     Responsible for the development and implementation of a new contractual correctional health care services subsidiary.

·     In three years was able to obtain fourteen national contracts with revenues of over $14 million.

·     Responsible for proposal, presentation, and budget preparation for each bid.

·     Developed brochures, ads, and presentations.

·     Trained and provided project supervision to the subsidiary's sales force.

**1988-1990**     **Wackenhut Corrections Corporation, Coral Gables, Florida**
*Vice President, Medical Services*

·     Responsible for development, budget, organization, and overall supervision of medical services provided at fourteen detention and/or correctional facilities on a national basis.

·     Proposal writing, marketing presentation, and bid preparation.

·     Fiscal and operational management with a total budget responsibility of $7 million.

·     Developed a new correctional health care division and was awarded three (4) contracts within a six (6) month period.

·     Supervised 200 nursing and professional staff.

·     Five (5) national contracts were accredited by the National Commission on Correctional Health Care.

4

- · Developed policy and procedure manuals and treatment protocols for all facilities.

- · Negotiated all laboratory, pharmacy, hospital, and physician contracts.

**1979-1988**   **Prison Health Services, Inc., New Castle, Delaware**
*Co-Founder and Vice President*

- · Developed the first contractual correctional health care company in the United States.

- · Responsible for all aspects of the day-to-day administrative, fiscal and operational management of nine (9) contracts in the states of Florida, Virginia, and Georgia.

- · Responsible for the care of a population of more than 10,000 inmates.

- · Developed and maintained Quality Assurance and Utilization Review programs.

- · Experienced in legislative writing, testified as an expert in correctional health care before Florida Legislature.

- · Consulted as expert witness in correctional health care lawsuits.

- · Developed first policy and procedure manuals for Prison Health Services.

- · All Florida, Virginia, and Georgia contracts were accredited by the National Commission on Correctional Health Care (NCCHC).

- · Organized and coordinated correctional conferences on "AIDS" and "Jail Health Care and Legal Liabilities".

**1977-1979**   **Sacred Heart Hospital, Chester, Pennsylvania**
*Operating Room Supervisor*

- · Responsible for budget, scheduling, staffing and coordination of operating and recovery room departments.

**Sacred Heart Hospital, Chester, Pennsylvania**
*Prison Health Service Coordinator*

5

·      Designed a proposal and established a new health care program for corrections in conjunction with Sacred Heart Hospital.

**1976-1983**      **Delaware National Guard, New Castle, Delaware**
*Major, Army Reserve*

·      Responsible for supervision, training and evaluation of Corpsmen.

·      Taught in Army-sponsored LPN program.

**Teaching Experience:**

**2010- Ongoing**      **University of Colorado School of Nursing, Colorado Springs, Colorado**
*Lecturer*
On-line course in Correctional Health Care and
Ethics and Legal issues in Correctional Health Care

**1995-2005**      **Duke University, School of Nursing Administration, Durham, North Carolina**
*Adjunct Assistant Professor*

·      Responsible for development of a course for nurse practitioners and nurse administrators on "Entrepreneurial Ventures in Nursing".

**1990-1991**      **Widener University, School of Nursing, Chester, Pennsylvania**
*Adjunct Assistant Professor*

·      Responsible for development and marketing, recruitment and enrollment management plan for nursing school.

·      Clinical instructor in RN/BSN program.

**1977-1982**      **Delaware Technical and Community College, Stanton, Delaware**
*Curriculum Coordinator*

·      Responsible for planning and coordination of nursing curriculum for Associate Degree Programs, selection of students, and recruitment and orientation of nursing facility.

6

· Courses taught were Advanced Medical Surgical Nursing and Human Sexuality.

· Exchange Professor to Taiwan in 1982. Taught Research and Physical Assessment to graduate nursing students at Foo Yen College.

**1977-1981**          **University of Delaware, Newark, Delaware**
*Clinical and Classroom Instructor*

· Taught refresher course for Registered Nurses.

**Clinical Experience:**

**1967-1975**          **Wilmington Medical Center, Wilmington, Delaware**
*Staff and Charge Nurse*

· Areas included medical - surgical nursing, intensive care unit and operating room.

**Professional Affiliations:**

Board Member Board of Trustees for NCCHC (2007-2011)
American Nurses Association Task for Revision of Standards for Correctional Health Care for Nurses 2002, 2011
American Nurses Association (ANA)
ANA Representative on Board for National Commission on Correctional Health Care (1986-1995)
Delaware Nurses Association
        President (1988-1990)
        Treasurer (1980-1982)
        Executive committee (1978-1980)
American Correctional Health Care Association Board Member (2002-2006)
Phi Kappa Phi - Honor Society of University of Maryland
American Jail Association
Colorado Nurses Association

**Legislative**

· Board of Advisor - Widener University School of Nursing
Governor's Task Force in Heath Care Manpower in Delaware (10/88-3/90)
Editorial Review of Health Care Manuscripts for the American Corrections Association Journal, Correction's Today

Board of Advisors for West Side Health Center, Wilmington, Delaware

**Publications:**

Issues and Trends in Nursing. Task Force for ANA Standards for Correctional Health Care. Currently in print by the American Nurses Association.

Moore J.  Legal Considerations in Correctional Nursing. Springer Publishing Company in Essentials of Correctional Nursing. New York 2013.

Moore, J., Spears, B. Charting with a Jury in Mind.  Correctional Health Report Volume 12 No 3.  March/April 2011

Moore J. Bernard Harrison, his life and the legacy he left behind. *Correctional Health Report.* September 2004.

Moore J.  Harvesting Life's Lessons. *Correctional Health Report* September 2004.

Moore J. Management & Administration of Correctional Health Care: Policy, Practice and Administration. Civic Research Institute, Inc. 2003.

Moore J.  Juvenile Health Care. *Journal for Juvenile Justice and Detention Services*, 1999.

Moore, J. Juvenile Corrections: A Public View of the Private Sector.  *Corrections Management Quarterly (1999.*

Moore, J.  Correctional Health Care Forms, Checklists and Guidelines Aspen Publications, May, 1999.

Moore, J.  Juvenile Health Care. *Corrections Management Quarterly (1999).*

Moore, J.  Privatization of Inmate Health Care.  A new approach to an old Problem. *Corrections Management Quarterly,* (1999).

Moore, J.  Considering the Private Sector in Health Care Management Issues in Corrections (Kenneth L Faiver ed., United Book PressAmerican Correctional Association, 1998).

Moore, J.  Informed Consent with Prisoners in Research:  Issues, Dilemmas, and Regulations.  *CORRECTCARE.*  June-July 1995.

Moore, J.  Exploration of Factors Affecting the Nursing Shortage in a Correctional Heath Care Delivery System.  *American Jails*, 1991.

Moore, J.  Saints Among Sinners.. *The Reporter*. 1991.

Moore, J., Study on Nursing Shortage in Correctional Health Care. *CORRECTCARE*, 1989.

Moore, J., Privatization of Prison Health Services. *The Privatization Review*, (1986).

Moore, J., Prison Health Care:  Problems and Alternative in the Delivery of Health Care to the Incarcerated.  (Part I and Part II).  *Florida Medical Association, Inc.*, (1986).

Moore, J.  Institutional Health Care:  Emergence of a New Perspective. *California Correctional News*, (1985).

Moore, J.,  Contracted Health Care. - New Approach to an Old Problem.  *Corrections Today*, (1984).


**<u>Presentations:</u>**

American Correctional Health Care Conference New Orleans, LA . (March 2014).

National Commission on Correctional Health Care.  "Nursing Outcomes Identification and Planning" Denver, Co (April 23, 2013).

Bureau of Labor Statistics Hyattsville, Maryland Overview of Privatization of Correctional Health Care and Cost of Inmate Health Care Hyattsville Maryland (June 28-29, 2010.)

National Commission on Correctional Health Care "Charting with a Jury in Mind" Orlando, Florida (October 2009).

"National Commission on Correctional Health Care "Accreditation Juvenile Standards". Los Vegas, Nevada. (October 2008 & October 2009).

National Commission on Correctional Health Care "Accreditation Jail Standards (May 2008).

National Commission on Correctional Health Care "Accreditation Juvenile Standards". Orlando, Florida. (October 2007).

National Commission on Correctional Health Care "Budget Preparation and Presentation of the Non-Financial Professional" Nashville, Tennessee (October 2007).

National Commission on Correctional Health Care "Budget Preparation and Presentation for the Non-Financial Professional" Atlanta, Georgia. (October 2006).

American Correctional Health Association "Contemporary Issues in Juvenile Health Care". ( March 27, 2004)

Chicago Public Health and Corrections Special Focus on Women's Issues "Benefits of Quality Correctional Health Care: The Accreditation Process with a Special Emphasis on Women Offenders". Chicago Illinois (November 12, 2003).

Health and Medicine Policy Research Group "Healing Girls in the Juvenile Justice System: the Challenge to our Community. Chicago, Illinois (July 9, 2003).

American Correctional Association "The Private Sector- How Good is the Care" Phoenix, Arizona (January 15, 2000).

Georgia Department of Juvenile Justice Office and Medical Services Training "Overview of Juvenile Health and Conditions affecting Juvenile Health Care". Wrightsville, Georgia (June 7-9, 1999).

University of Massachusetts Medical School "Correctional Health Care- A Quest for Quality". Worcester, Massachusetts. (June 16, 1999).

National Commission on Correctional Health Care, "Findings of an Evaluation Research Study Designed to Evaluate Cost and Quality of Managed Health Care in the State of Texas Prison and Juvenile Facilities". Long Beach, California, (November, 1998).

South Dakota Department of Correction, "Managing Health Care in a Correctional Setting". Sioux Falls, South Dakota, (October 8-9, 1998).

Wisconsin Department of Corrections, Training Seminar, "Jail Health Care Key Issues". Wisconsin Rapids, Wisconsin, (May 1995).

National Commission on Correctional Health Care, "Ethical Issues in Nursing", Chicago, Illinois, (September 1993).

Florida Criminal Justice Executive Institute, "Operational Concerns - Medical Issues", St. Petersburg, Florida, (April 15, 1992).

American Academy of Criminal Justice Sciences, "The Effects of the Nursing Shortage in Correctional Health Care".  Pittsburgh, Pennsylvania, (March 10, 1992).

Anchorage World Congress of Prison Health Care, "Exploration of Factors Affecting the Nursing Shortage in Correctional Health Care Delivery System", Anchorage Alaska (May 6-9, 1991).

American Correctional Health Services Association, "Correctional Nursing - The Decade Ahead", Baltimore, Maryland, (March 2, 1991).

10

Annual School for Sheriffs and Jailers, "Medical Care in the U.S. Jails", Institute of Government at UNC, Chapel Hill, North Carolina, (January 23, 1990).

Thirteenth National Conference on Correctional Health Care sponsored by the National Commission on Correctional Health Care, "Nursing Shortage in County Jails", Chicago, Illinois. (November 10, 1989).

National Conference on Alternatives to Jail and Prison Overcrowding, "AIDs  Challenge to Corrections", Orlando, Florida., (October 9, 1989).

American Jail Association Annual Conference, "Recruitment and Retention of Personnel", Hollywood, Florida. (May 1, 1989).

Twelfth National Conference on Correctional Care sponsored by the National Commission on Correctional Health Care, "AIDS:  Challenge to Corrections", Lake Buena Vista, Florida. (March 9-11, 1988).

American Correctional Health Services Conference, "Correctional Health Care: Economic, Organizational and Legal Barriers", Philadelphia, Pennsylvania. (April 1-3, 1987).

Academy of Criminal Justice Sciences, "Prison Health Care:  Problems and Alternatives", Orlando, Florida, (March 7-21, 1986).

The Measurement of Clinical and Educational Outcomes, "Development of a Health Assessment Evaluation Instrument", New Orleans, Louisiana, (June 27-28, 1985).

American Jail Association Annual Conference, "Contracting for Health Care in Prisons and Jails". (May 31, 1984).

Criminal Justice Center, Sam Houston State University, Huntsville, Texas, "An Alternative Approach to Health Care in Prisons". (May 29, 1984).

Potomac '83 Conference, "Correctional Health Nursing", Potomac, Maryland. ( November 1983).

11