# Exhibit "B"

**JACQUELINE MOORE & ASSOCIATES**

**5861 S Albion Ct, Greenwood Village CO 80121
(303) 771-1637    moor143@outlook.com**

Mr. Dale K. Galipo
Law Offices of Dale K. Galipo
21800 Burbank Blvd, Suite 310
Woodland Hills, CA 91367

Mr. John C. Fattahi
Attorney at Law
1301 West Glenoaks Blvd
Glendale, CA 91201

Dear Mr. Galipo and Mr. Fattahi:

This letter is a rebuttal report regarding opinions expressed by Philip Lawrence Consulting Services regarding <u>Stephany Borges v. City of Eureka, et al.</u>, Case No. 15-cv-00846-YGR in the United States District Court for the Northern District of California.

Mr. Lawrence had nine opinions regarding his review of his case. After reviewing his report, I reviewed additional materials: California Nurses Association: Nursing Practice & Patient Advocacy Alert: Patient Assessment: Roles of RNs and LVNs; the California Medical Association Institute for Medical Quality 2007 Health Care Accreditation Standards for Adult Detention Facilities; CMA IMQ 2010 2/23/2010 Letter to HCCF Captain Wilkinson. My comments follow.

Opinion 1:

A thorough review of the biennial inspections of the Humboldt County Sheriff's Department (HCSD) by the Board of State and Community Corrections (BSCC), annual Environmental Health inspection reports to include medical and mental health evaluations, comments from the BSCC inspection reports relating to the fire inspection reports and the last California Medical Association Institute for Medical Quality (IMQ) inspection report dated February 23, 2010, find the HCSD operating a jail in compliance with established mandates, regulations, standards, policies and procedures.

Comment:

1

I have recently received documentation regarding the annual inspection from the Institute for Medical Quality in 2010. That accreditation period expired on February 22, 2012, and therefore was not in place at the time of the Borges incident in 2014. I have not seen any indication that further IMQ accreditation was sought after it expired in February 2012, and Mr. Lawrence represents that 2010 was the last IMQ inspection. .As the former director of operations for the National Commission on Correctional Health Care (NCCHC) and lead surveyor for this organization, which apparently has not accredited HCCF, it is my opinion that when there is an audit, the auditors only see a snap shot of time while they are there. They are not privy to procedures, practices or decisions that occurred prior to the audit or even after the audit are completed. During the Borges incident, many of the IMQ standards were not met, including:

- 110 Transfer of Inmates with Acute Illnesses
  - Written policy and defined procedures require referral of patients with acute psychiatric and other serious illnesses as defined by the health authority. Patients who require health or mental health care beyond the resources available in the facility, or whose adaptation to the correctional environment is significantly impaired, are transferred or committed to a facility where such care is available.
  - Each facility should have standard operating procedures which describe how staff should identify and respond to situations in which serious medical or psychiatric need warrants transfer from the facility.
  - To meet IMQ compliance, the "Licensed health personnel" as referenced in CCR, Title 15, Section 1209 must be a physician, mid-level practitioner, or registered nurse for medical conditions, and physician, psychiatric registered nurse, psychologist, licensed clinical social worker, or licensed marriage family therapist for mental conditions. (See also CCR, Title 15, and Section 1209.)
- 204 Basic Training for Correctional Personnel
  - It is imperative that facility personnel be made aware of potential emergency situations, what they should do in facing life-threatening situations, and their responsibility for the early detection of illness and injury.
  - At a minimum, there should be eight hours every two years devoted to training addressing these specific issues.
- 302 Receiving Screening
  - Receiving screening must be performed by health-trained, certified, or licensed health care personnel on all inmates immediately upon arrival at the facility.

2

- o When trained custody staff conducts the screening, procedures shall require subsequent review by licensed health care staff of any positive finding.
- o Arrestees who are unconscious, semi-conscious, bleeding, or otherwise obviously in need of immediate medical attention are referred for medical care prior to acceptance.
- o It is generally recognized that alcohol related suicides, and unassisted drug or alcohol withdrawals contribute significantly to deaths in custody. It is considered extremely important for booking officers to explore the inmate's suicide and/or withdrawal potential. Reviewing with the inmate any history of suicidal behavior and visually observing the inmate's behavior (communication difficulties, speech and posturing, impaired level of consciousness, disorganization, memory defects, depression, or evidence of self-mutilation) are recommended.
- 303 Substance Abuse
  - o For sobering cells, at a minimum, the inmate must be under close observation by a health-trained custody staff member or health care worker. Safety checks should be made and documented every 15 minutes by medical or custody staff to ensure that the inmate can be aroused and that there are no safety concerns.
  - o The degree of contact with the inmate may vary according to the inmate's level of consciousness and ability to respond to verbal stimuli. Each check should verify that the inmate's condition has not deteriorated.
  - o The detoxification of certain patients (e.g., psychotic, seizure prone, pregnant, or geriatric) may pose special risks, and thus require special attention.
  - o It has been clearly documented that inmates exhibiting symptoms of acute intoxication pose the most serious risk for a jail. Such individuals may be unable to provide a clear history of past medical problems, involvement in altercations, or auto accidents. Such individuals must be closely monitored and observed to assure their mental and physical status is not deteriorating. Incidents of sudden death due to cocaine usage have underscored the importance of close monitoring of these individuals.
- 304 Access to Treatment
  - o Information regarding access to health care services must be communicated to inmates orally and in writing in a language the inmate comprehends upon arrival at the facility.
- 602 Informed Consent

3

- o Any competent inmate may refuse, verbally or in writing, both emergency and non-emergency medical and mental health care. Informed refusal is the denial, by the patient to a treatment, examination, or procedure after the patient receives the material facts regarding the nature, consequences, risks, and alternatives concerning the proposed treatment, examination, or procedure.
- o Obtaining informed consent may not be necessary in all cases. Examples include emergency care for patients who do not have the capacity to understand the information given, and emergency psychiatric intervention.

Further, the facility was not in compliance with NCCHC J-C-04 Health Training for correctional officers because the officers that were on duty during the booking process had not any training or and the timeframe of the training of the officer who actually performed the intake screening training that exceeded both the NCCHC standard and the policy of Humboldt County regarding training.

Cpl. Bittner's training log shows she had last completed the four-hour "Medical Issues" training more than three years before the incident, and Officer Swim had never completed it before the incident. The deposition testimony of the officers of HCCF revealed inconsistent information regarding training on conducting a pre-booking screen and specifically when to contact medical staff for assistance. Officer Bittner testified that she received some training, while Cpl. Hammer and Officer Swim testified that they did not have any training.

The facility also was not in compliance with California Scope of Practice requirements relating to the limited duties of LVNs and Correctional Officers, by permitting them to perform medical assessments and evaluations without the personal involvement of RNs.

Opinion 2:

A careful review of all documents and video recordings related to the law enforcement and custodial staff interactions with Mr. Daren Borges on June 13, 2014, show an individual clearly under the influence of a stimulant and do not alert to the pending medical emergency that would begin at approximately 1600 hours.

Comment:

4

I agree that Mr. Borges was obviously acutely intoxicated with a stimulant; however, the response of staff to his obvious need for emergency medical care was insufficient. Based on the video recording of Mr. Borges, his medical and mental health condition and his condition described by various officers, Mr. Borges should have been refused for booking and sent to the Emergency Department for medical treatment and/or clearance. According to the arresting officers, Mr. Borges was sweating profusely, agitated, having apparent hallucinations, was in a semi-conscious state, had tremors, was observed hitting his head and was "meth'ed out," and likely had an elevated pulse, BP, respiration rate and temperature. During the booking process he was distracted, unable to follow directions, did not answer all of the questions. Taken together, these circumstances indicate he required emergency medical treatment and was at risk of death.

Opinion3:

The HCSD medical/mental health screening of Mr. Daren Borges completed by jail custodial staff on June 13, 2014, was in compliance with the minimum jail standards required under Title 15 of the California Code of Regulations, the California Medical Association's Institute for Medical Quality (IMQ) for Corrections and Detentions (2013 Edition) standard 302 and in compliance with the HCSD policy and procedures

Comment:

I agree that the receiving screening form has all of the elements required by the standard. The standard also involves some degree of judgment of the individual completing the form. However, Mr. Borges was sweating profusely, was disoriented to person, place and time, and medical staff was not summoned or vital signs taken; instead, he was accepted and placed in a sobering cell, in violation of CMA IMQ Standard 302 and County written policies.

Opinion 4:

The placement and retention of Mr. Daren Borges in the sobering cell on June 13, 2014, was in compliance with the minimum jail standards required of Title 15 of the California Code of Regulations and in compliance with the HCSD policies and procedures.

5

Comment:

HCSD written policy, like CMA IMQ Standard 302, required a nurse to assess and evaluate the inmate prior to placement in the sobering cell if there were any positive screening findings. This written policy was not followed regarding Mr. Borges. Further, LVNs in California may not perform patient assessments or evaluations; they may only collect data. Further the CMA IMQ Standards regarding sobering cell safety checks, which are echoed in the County's written policies, were not followed.

Opinion 5:

The HCSD had sobering cell policies and procedures in place on June 13, 2014 that exceeded the minimum jail standards required under Title 15 of the California Code of Regulations. The HCSD custodial staff was in compliance with these increased standards during the placement and retention of Mr. Daren Borges into the sobering cell.

Comment:

The written policy of HCCF was to notify medical staff for an assessment prior to placement in the sobering cell if there were any positive findings during the receiving screening. The county officers at Humboldt County Correctional Facility (HCCF) failed to follow written policies and procedures regarding conducting a through intake receiving screening in the intake area, resulting in Mr. Borges being improperly accepted for booking without medical clearance.

Opinion 6:

The emergency response of the HCSD custodial staff to Mr. Daren Borges's medical emergency was swift, professional and within industry training norms. The request for emergency assistance, the response of Fire Department and ambulance personnel to the HCSD jail and Mr. Borges's transportation to St Joseph's hospital was completed rapidly.

Comment:

6

Mr. Borges should have been thoroughly assessed and monitored prior to his medical emergency. Nurse Hampton failed to conduct a proper medical assessment of Mr. Borges while he was in the sobering cell.

Nurse Hampton did not have nor did she ascertain any medical or mental health information regarding Mr. Borges. She walked up and looked at the log and then signed it. She made no attempt to try to get Mr. Borges' attention and did not know if he was hallucinating (pg. 74). She then walked away and made no attempt to further assess Mr. Borges. Nurse Hampton should have been under the direct supervision of an RN, or an RN should have performed the assessment. Regardless, Nurse Hampton should have realized from her brief assessment that this patient needed a further assessment and medical attention. Her assessment should have occurred an hour prior to the discovery that Mr. Borges was unresponsive.

Opinion 8:

I find the HCSD does a competent job of ensuring their custodial staffs are adequately trained. All custodial staff who were involved with the medical screening, placement and retention of Mr. Borges in the sobering cell and the response to his medical emergency were current with the mandated training requirements of the Standards and Training for Corrections (STC). All custodial staff receives specialized training to work in the booking/intake area of the jail and were required to attend medical issues and mental health training in fiscal year 2012/2013. Deputies Hammer, Bittner, Corral, Esget, Rogers. Basler, and Supervisor Hershberger attended a drug recognition & identification training on April 9, 2014. All custodial staff who provided emergency lifesaving efforts to Mr. Borges were CPR and first aid trained.

Comment:

The officers had CPR training, however as stated above they did not have sufficient training regarding conducting the receiving screening. If policy had been followed this patient would not have suffered a critical event in the jail but instead would have been sent to the emergency room for clearance.

Sincerely,

*Jacqueline M Moore*

7

Jacqueline M. Moore RN PH.D. CCHP-A, CCHP-RN